165 F.3d 667
 99 Cal. Daily Op. Serv. 326, 99 Daily Journal
D.A.R. 403
Panchita HODGERS-DURGIN, individually and on behalf of all
others similarly situated; Antonio V. Lopez,
individually and on behalf of all others
similarly situated,
Plaintiffs-Appellants,
v.
Gustavo de la VINA, in his official capacity; Ronald E.
Sanders, in his official capacity; Stephen
Norman, in his official capacity,
Defendants-Appellees.
 No. 97-16449.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 11, 1998.
Decided Jan. 12, 1999.
 
 1
 Armand Salese, Salese & McCarthy, Tucson, Arizona, for plaintiffs-appellants.
 
 
 2
 Brenda E. Ellison, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the District of Arizona; John M. Roll, District Judge, Presiding. D.C. No. CV-95-00029-JMR.
 
 
 4
 Before: BROWNING and SNEED, Circuit Judges, and RHOADES,* District Judge.
 
 
 5
 Opinion by Judge RHOADES; Dissent by Judge SNEED.
 
 RHOADES, District Judge:
 I. Overview
 
 6
 Plaintiffs, suing on behalf of themselves and a class of persons, allege that the United States Border Patrol routinely stops Arizona motorists without reasonable suspicion, in violation of the Fourth Amendment. Plaintiffs have sued three supervisory officials of the Border Patrol.
 
 
 7
 Plaintiffs appeal from the district court's denial of class certification and grant of summary judgment in favor of Defendants. For the reasons stated below, we reverse in both respects and remand for further proceedings.
 
 II. Background
 
 8
 United States Border Patrol agents patrol the highways of southern Arizona in an effort to enforce the nation's immigration laws. Border Patrol agents often stop motorists and question them. These stops are "seizures" within the meaning of the Fourth Amendment. See United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Nicacio v. United States INS, 797 F.2d 700, 702 (9th Cir.1986).
 
 
 9
 Plaintiff Panchita Hodgers-Durgin, an American citizen, lives in southern Arizona and commutes on its highways. She left a friend's house late one night and drove home. While enroute, she passed a parked Border Patrol unit, which followed her. She then began to have mechanical problems, with her car repeatedly slowing of its own accord before speeding up again. She exited the highway and continued her journey on a surface street.
 
 
 10
 Minutes later, the Border Patrol agent stopped her. The agent inquired about her citizenship and asked her to open the car's hatchback. The agent searched the cargo area and, finding no contraband, departed.
 
 
 11
 Plaintiff Antonio Lopez, an Arizona resident of Hispanic appearance, had a similar encounter. One afternoon, Lopez was driving the speed limit in the "slow lane." A Border Patrol unit drew abreast of Lopez in the "fast lane." The Border Patrol unit then accelerated and moved into Lopez's lane directly in front of him. The unit slowed dramatically, and Lopez had to slow accordingly. Lopez drove behind the unit briefly but then changed lanes and continued his journey at the speed limit.[1]
 
 
 12
 The Border Patrol agent stopped Lopez. The agent asked to search the car, and Lopez consented. Finding nothing, the agent allowed him to leave.
 
 
 13
 The record indicates that Border Patrol agents have stopped numerous people of Hispanic appearance, some repeatedly. Agents have stopped them both during day and night hours. For example, Border Patrol agents reportedly have stopped two Arizona residents, Javier Barajas and Jose de la Vara, at least three times each. Border Patrol agents allegedly have detained another Arizona commuter, Luis Villa, numerous times. Each time, the agents discovered no evidence of wrongdoing.
 
 
 14
 In addition, the record contains numerous reports written by Border Patrol agents that describe the reasons they stopped Hispanic motorists during the day and night, and the reasons they stopped other motorists at night. Some of these reports, known as I-44s, do not describe facts that give rise to reasonable suspicion for these stops, as required by the Fourth Amendment.[2] (See, e.g., Pls.' Mot. to Reconsider Class Certification at 6 (quoting an I-44 that stated only that a newly painted car contained two Hispanic males)). Other reports that adequately describe such facts bear striking similarity to each other--indeed, they are identical except for such details as the time of day, the color of the vehicle, etc. (See id. at 13-15 (quoting several I-44s)). We have previously expressed skepticism about the veracity of such reports. See United States v. Garcia-Camacho, 53 F.3d 244, 246 (9th Cir.1995) (expressing skepticism about "mere rote citations" of facts that give rise to reasonable suspicion); United States v. Rodriguez, 976 F.2d 592, 595 (9th Cir.1992) (stating that "this profile is so familiar, down to the very verbiage chosen to describe the suspect, that an inquiring mind may wonder about the recurrence of such fortunate parallelism in the experiences of the arresting agents"), amended on other grounds, 997 F.2d 1306 (9th Cir.1993).[3]
 
 
 15
 Following their stops, Lopez and Hodgers-Durgin sued three supervisory officials of the Border Patrol (Defendants herein).[4] Plaintiffs claim that the Border Patrol engages in a "pattern and practice" of stopping motorists of Hispanic appearance on less than reasonable suspicion, in violation of the Fourth Amendment. Plaintiffs also claim that the Border Patrol similarly stops motorists of any ethnicity at night (it is, obviously, difficult to ascertain a passing motorist's ethnicity at night). Plaintiffs sought only declaratory and injunctive relief.
 
 
 16
 Plaintiffs sued on behalf of themselves and the following class of persons: everyone who drives on highways in southern Arizona at night, and everyone of Hispanic appearance who drives on highways in southern Arizona at any time.[5] Plaintiffs moved for class certification. Defendants opposed the motion and filed a Motion to Dismiss, arguing that Hodgers-Durgin and Lopez lacked standing.
 
 
 17
 The district court first held that for standing purposes, it must assess the standing of the class as a whole, rather than the standing of the named Plaintiffs. The district court therefore deferred ruling on the Motion to Dismiss until after it decided the class certification issue. The court then considered whether it should certify the class. It answered this question in the negative, finding that the "commonality" and "typicality" requirements of Federal Rule of Civil Procedure 23(a) were not satisfied. The court's refusal to certify the class left only Hodgers-Durgin and Lopez as Plaintiffs. The district court then found that they lacked standing. Construing the Motion to Dismiss as a motion for summary judgment, the court granted summary judgment for Defendants.[6]
 
 
 18
 Plaintiffs timely appealed to this Court, which has jurisdiction under 28 U.S.C. § 1291.
 
 III. Discussion
 
 19
 The first question is whether Plaintiffs have standing. Answering this question requires determining whether we should assess the standing of the named Plaintiffs only, or the standing of the class as a whole. If Plaintiffs have standing, the next question is whether the district court properly refused to certify the class.
 
 A. Standing
 1. Standard Of Review
 
 20
 We review the district court's standing determination and grant of summary judgment de novo. See C.N.R. Atkin v. Smith, 137 F.3d 1169, 1170 (9th Cir.1998) (summary judgment); Johns v. County of San Diego, 114 F.3d 874, 876 (9th Cir.1997) (standing). At the summary judgment stage, we affirm only if Plaintiffs have not adduced any evidence from which they may be able to establish standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). We construe all evidence in the light most favorable to Plaintiffs. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).
 
 
 21
 2. Whether The Court Should Assess The Standing Of The Named Plaintiffs Or The Standing Of The Class
 
 
 22
 Plaintiffs argue that we should determine the standing of the class itself. Plaintiffs rely on Nicacio v. United States INS, 797 F.2d 700, 702 (9th Cir.1985), and LaDuke v. Nelson, 762 F.2d 1318, 1325-26 (9th Cir.1985), as amended, 796 F.2d 309 (9th Cir.1986). In these cases, we held that "[f]or standing purposes, this court's inquiry must focus on the standing of the class to seek equitable relief." LaDuke, 762 F.2d at 1325; see also Nicacio, 797 F.2d at 702 (stating that "we look not merely to the possibility of injury to one individual, but to the foreseeability of harm to members of an entire class").
 
 
 23
 These cases are distinguishable. In each case, the district court already had certified the class before we undertook our standing inquiry, thereby giving the class " 'a legal status separate from the interest' " of the named plaintiffs. LaDuke, 762 F.2d at 1325 (quoting Sosna v. Iowa, 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). "Standing, however, is a jurisdictional element that must be satisfied prior to class certification." Id. This "requires the litigant to 'establish[ ] the requisite of a case or controversy with the defendants.' If the litigant fails to establish standing, he may not 'seek relief on behalf of himself or any other member of the class.' " Nelsen v. King County, 895 F.2d 1248, 1250 (9th Cir.1990) (quoting O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)); see also Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (holding that the fact "[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured") (internal quotation marks and citations omitted); Lee v. Oregon, 107 F.3d 1382, 1390 (9th Cir.) (holding that standing must exist prior to class certification), cert. denied, --- U.S. ----, 118 S.Ct. 328, 139 L.Ed.2d 254 (1997); Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 2.09 (3d ed.1993) (stating that "individual standing requirements constitute a threshold inquiry"). Thus, we must address the threshold question of whether the named Plaintiffs have standing.
 
 
 24
 3. Whether The Named Plaintiffs Have Standing
 
 
 25
 The district court held that the named Plaintiffs lack standing because they had not adduced facts that suggested that the Border Patrol might stop them again. The district court noted that Hodgers-Durgin and Lopez have driven thousands of miles in southern Arizona in recent years, but Border Patrol agents have stopped them only once. See Durgin v. De La Vina, 174 F.R.D. 469, 474 (D.Ariz.1997). With this analysis, the district court rested its decision solely on statistical probabilities.[7]
 
 
 26
 In determining whether Plaintiffs have standing to sue for injunctive and declaratory relief, "past exposure to harm is largely irrelevant...." Nelsen, 895 F.2d at 1251. Rather, Plaintiffs must show a "credible threat" of future injury. Kolender v. Lawson, 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); see also City of Los Angeles v. Lyons, 461 U.S. 95, 108, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (requiring a "sufficient likelihood" of future injury). Therefore, we must find that Plaintiffs face a credible threat of being stopped in the future, regardless of whether they were stopped in the past. To conclude that such a threat exists requires us to find that Plaintiffs have adduced facts that, if true, prove the Border Patrol has a pattern and practice of stopping persons without reasonable suspicion; without a pattern, Plaintiffs cannot prove that they face a credible threat of future harm in what would necessarily be a random, relatively isolated incident.
 
 
 27
 We have found standing in other instances where some systematic pattern exists. This court held in Gonzales v. City of Peoria that plaintiffs had standing to demand equitable and declaratory relief. Gonzales v. City of Peoria, 722 F.2d 468, 481 (9th Cir.1983). "By alleging that all [city police] officers make a practice, based on city policy, of violating the constitutional rights of [city] residents of Mexican descent, and that this policy is consistently applied to drivers and passengers of vehicles stopped for traffic violations, [the] plaintiffs have demonstrated a sufficient future threat of constitutional violations." Id.; see also Nelsen, 895 F.2d at 1254 (collecting cases and noting that courts have found standing where "some systematic pattern ... exists").[8]
 
 
 28
 In our standing inquiry, we also rely on other principles articulated by this court and the Supreme Court. First, a plaintiff does not have "standing where the litigant's claim [to future injury] relies upon a chain of speculative contingencies"--especially when the occurrence of those contingencies depends on plaintiff's own behavior. Nelsen, 895 F.2d at 1252; see also, e.g., Lyons, 461 U.S. at 108, 103 S.Ct. 1660 (stating that "[w]e cannot agree that the 'odds' that [the plaintiff] would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief"); O'Shea, 414 U.S. at 497, 94 S.Ct. 669 (finding no standing because the plaintiffs could not establish that they would violate the law, be charged, held to answer, and tried in flawed proceedings).
 
 
 29
 Second, we cannot reduce our standing analysis "to considering probability merely in terms of quantitative percentages." Nelsen, 895 F.2d at 1250. Rather we must consider "qualitative" aspects of the case, i.e., we must make an "individualized inquiry" and "consider all the contingencies that may arise in the individual case before the future harm will ensue." Id. at 1250-52. In LaDuke, Immigration and Naturalization Service agents routinely subjected migrant farm workers to warrantless house searches.[9] We found standing partly because "the members of plaintiff class do not have to induce a police encounter before the possibility of injury can occur. The class members are subject to constitutional injury based on ... completely innocent behavior...." LaDuke, 762 F.2d at 1326.
 
 
 30
 Plaintiffs produced evidence of a pattern and practice of stopping persons without reasonable suspicion in the numerous I-44s they submitted. Many of these reports do not describe facts that give rise to reasonable suspicion, and many of the reports list similar and repetitive reasons for stopping various persons. Plaintiffs also produced evidence of other persons of Hispanic appearance the Border Patrol had stopped, allegedly without reasonable suspicion. The Border Patrol had stopped some of these persons on numerous occasions. These persons complaining of the illegal stops were stopped both during the day and night hours.
 
 
 31
 Looking at mere statistical probabilities, Plaintiffs are unlikely to be stopped by the Border Patrol each time they drive on the highways in southern Arizona. However, as discussed above, we cannot rely solely on quantitative percentages. A "chain of speculative contingencies" need not occur before the Border Patrol stops Plaintiffs again. Plaintiffs merely must embark on a routine journey and pass a Border Patrol agent who, pursuant to the alleged pattern and practice, decides to stop them for no legitimate reason. In these circumstances, a credible threat of future injury hangs over Plaintiffs' heads every time they drive on these highways.[10]
 
 
 32
 Accordingly, we conclude that Plaintiffs have adduced facts that evidence the existence of a credible threat of future injury, and therefore, have standing to seek injunctive and declaratory relief.[11] We reverse the district court's grant of summary judgment.[12]
 
 
 33
 B. Whether The District Court Properly Refused To Certify The Class
 
 
 34
 The next question is whether the district court properly refused to certify the class.
 
 1. Standard Of Review
 
 35
 We review a district court's refusal to certify a class for abuse of discretion. See Wade v. Kirkland, 118 F.3d 667, 669 (9th Cir.1997). A district court abuses its discretion if it rests its decision on an inaccurate view of the law. See McClaran v. Plastic Indus., Inc., 97 F.3d 347, 354 (9th Cir.1996).
 
 2. The Requirements Of Rule 23
 
 36
 A district court may certify a class if the plaintiffs demonstrate that all the requirements of Federal Rule of Civil Procedure 23(a) are satisfied and at least one of the requirements of Rule 23(b) is satisfied. See Fed.R.Civ.P. 23; Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir.1996). Rule 23(a) provides that a district court may certify a class
 
 
 37
 only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 38
 Fed.R.Civ.P. 23(a).
 
 
 39
 Plaintiffs sought class certification under Rule 23(b)(2), which provides for certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...." Fed.R.Civ.P. 23(b)(2). The district court did not discuss the requirements of numerosity or adequate representation or the requirements of Rule 23(b)(2) because it held the commonality and typicality requirements were not satisfied. We discuss this error of law, infra.
 
 
 40
 a. Commonality
 
 
 41
 The requirement of commonality "seek[s] to assure that the action can be practically and efficiently maintained [as a class action]." Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir.1994). "Class treatment makes no sense if there are no common issues; the trial court would gain nothing but logistical headaches from the combination of the cases for trial." Id. at 55.
 
 
 42
 The district court found that common legal and factual issues did not exist. The district court reasoned:
 
 
 43
 ... [P]roof of injury to the class would be a broad and difficult one to establish. The proof would require presentation of testimony from a large number of people who are ostensibly members of the class, who would describe their individual stops, from which the Court would be asked to infer a pattern and practice of unlawful stops.... The number of such witnesses is potentially staggering....
 
 
 44
 ....
 
 
 45
 [T]he absence of [commonality] is illustrated by differences between the circumstances surrounding the stop of Plaintiff Durgin and that of Plaintiff Lopez.... [E]ven the two named plaintiffs have very different factual claims and cannot be said to be typical ... of an entire class. To a greater or lesser degree, every traffic stop would present unique circumstances.
 
 Durgin, 174 F.R.D. at 471-72.[13]
 
 46
 We find the district court erred in holding that the commonality requirement was not met. First, although superficial differences exist among traffic stops, the relevant aspects of Plaintiffs' allegations are essentially the same. Second, the district court impermissibly relied on the potential unmanageability of the litigation in concluding that Plaintiffs' claims did not meet the "commonality" requirement. Third, case law indicates that a common question of fact exists if Plaintiffs complain of an unlawful pattern and practice, even if individual circumstances vary.
 
 
 47
 i. Factual Differences And Similarities
 
 
 48
 "[I]f material variations exist as to the law or facts involved with individual class member injuries, then the commonality requirement [cannot] be met." LaDuke, 762 F.2d at 1332 (emphasis added). Here, every traffic stop differs from every other because the agents presumably rely on different combinations of factors to stop different motorists.[14]
 
 
 49
 However, it is immaterial why or under what circumstances the agents stop motorists, as long as they stop them without reasonable suspicion. In other words, it is immaterial which factors the agents rely on. What is material are the factors that Plaintiffs allege the agents do not rely on: "specific and articulable facts" that give rise to "a reasonable suspicion ... that the vehicle contains aliens who may be illegally in this country." Nicacio, 797 F.2d at 702.
 
 
 50
 Given that Plaintiffs allege that the agents stop motorists without such "specific and articulable facts," there certainly are "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2); cf. LaDuke, 762 F.2d at 1331 (holding that the "minor differences in the manner in which the [named plaintiffs'] Fourth Amendment rights were violated does not render their claims atypical of those of the class") (footnote omitted).
 
 
 51
 ii. The Manageability Of The Litigation
 
 
 52
 The district court also found a lack of commonality because of a "potentially staggering" number of witnesses. The district court further noted its concerns that each class member's claim would be susceptible only to individualized proof.
 
 
 53
 We are mindful that "the district court is in the best position to consider the most fair and efficient procedure for conducting any given litigation." Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1309 (9th Cir.1977) (citation omitted). Nevertheless, we believe that the district court's concerns are exaggerated for three reasons. First, its concern about the number of witnesses is reduced by Federal Rule of Evidence 403, which gives the district court discretion to exclude cumulative evidence. Second, the district court in Nicacio certified an almost identical (albeit numerically smaller) class in a similar case, and the case apparently proceeded through trial unremarkably.[15]
 
 
 54
 Third, individualized testimony is not the only evidence in this case. The record contains scores of I-44s that document traffic stops. The district court, however, dismissed these records in a footnote because they "constitute incomplete evidence as to the totality of circumstances surrounding each stop." Durgin, 174 F.R.D. at 471 n. 5.
 
 
 55
 There is ample reason to believe, however, that the I-44s contain the most relevant information. Border Patrol supervisors regularly advise agents to write down the basis for their traffic stops. For example, one training bulletin apparently stated:
 
 
 56
 [Border Patrol agents'] written descriptions of "reasonable suspicions" are important not only to win the case against the suspect, but also to prove that agents acted properly in the event of civil lawsuits.... For example, if [agents] are unable to articulate "reasonable suspicion" to justify stopping a vehicle ... the government will be unable to prosecute the driver.... [F]urther, if the Border Patrol and/or individual agents are sued in a civil lawsuit alleging a pattern of discriminatory vehicle stops ..., [agents'] written description of "reasonable suspicion" will be critical to prove that the agents acted properly.... [Border Patrol agents] should note that at least four such lawsuits have already been filed against the Border Patrol, which have resulted in three court orders against the Border Patrol.... As such, [agents] are advised that a court finding of "bad" stops may have serious adverse legal consequences which may affect an agent or [patrol area] for many years.
 
 
 57
 (Reply to Resp. to Mot. for Recons. of Class Certification at 9-10 (quoting a Border Patrol memorandum)).[16]
 
 
 58
 In light of these dire warnings, one would expect the agents to put the most relevant information in the I-44s. Thus, even if the I-44s do not contain every detail of the stops, they have probative value that reduces the need for a "staggering" number of witnesses. They also constitute generalized proof applicable to the entire class.[17] In short, the district court's concerns of unmanageable litigation and individualized proof seem exaggerated.
 
 
 59
 iii. Case Law
 
 
 60
 Additionally, case law dictates that if plaintiffs allege an unlawful pattern of activity, the pattern itself constitutes a "common question of law or fact." This is especially true in actions for declaratory and injunctive relief.
 
 
 61
 In Walters v. Reno, the plaintiffs, on behalf of themselves and similarly situated noncitizens, sought declaratory and injunctive relief on the ground that certain INS procedures violated their procedural due process rights. Walters v. Reno, 145 F.3d 1032 (9th Cir.1998), petition for cert. filed, 67 U.S.L.W. 3337 (U.S. Nov. 3, 1998) (No. 98-730). The district court certified a nationwide class under Federal Rule of Civil Procedure 23(b)(2). On appeal, the government argued that the commonality requirement was not met "on account of factual distinctions in the class members' underlying claims." Id. at 1046. This court held that "[d]ifferences among the class members with respect to the merits of their ... cases, however, are simply insufficient to defeat the propriety of class certification." Id.
 
 
 62
 Other circuits have taken a similar approach. For example, in Alliance to End Repression v. Rochford, 565 F.2d 975 (7th Cir.1977), the plaintiffs alleged that Chicago law enforcement agencies subjected them to a "course and pattern of unconstitutional conduct" that manifested itself in numerous ways. Id. at 976. The plaintiffs sought injunctive and declaratory relief.
 
 
 63
 In reviewing the district court's class certification, the Seventh Circuit stated:
 
 
 64
 Defendants contend that there are no common questions of fact or law. It is their view that this suit really involves an aggregation of individual claims....
 
 
 65
 ....
 
 
 66
 Defendants' arguments ignore the gravamen of plaintiffs' complaint--the existence of an unconstitutional pattern and practice .... It is this pattern of unconstitutional activity ... that creates the common question of law or fact sufficient to satisfy Rule 23.
 
 
 67
 Id. at 978-79 (citations omitted and emphasis added).[18]
 
 
 68
 In Baby Neal v. Casey, 43 F.3d 48 (3d Cir.1994), the plaintiffs alleged that systemic problems in the Department of Health and Human Services prevented it from providing required child welfare services. The district court found that the plaintiffs could not meet the commonality requirement because each of the plaintiffs' claims arose out of individual circumstances. The plaintiffs sought injunctive and declaratory relief.
 
 The Third Circuit reversed, stating:
 
 69
 We underscore ... that neither [the commonality nor the typicality] requirement[ ] mandates that all putative class members share identical claims, and that factual differences among the claims of the putative class members do not defeat certification.
 
 
 70
 The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. Because the requirement may be satisfied by a single common issue, .... demonstrating that all class members are subject to the same harm will suffice.
 
 
 71
 ... Moreover, because they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2).
 
 
 72
 Id. at 56-57 (internal quotation marks and citations omitted).
 
 
 73
 These cases resemble the case at bar. The gravamen of Plaintiffs' claims is that the Border Patrol engages in a pattern and practice of stopping motorists without reasonable suspicion. "It is this pattern of unconstitutional activity that creates the common question of law or fact...." Rochford, 565 F.2d at 979 (emphasis added). Moreover, Plaintiffs allege that all members of the class are subject to unconstitutional stops. "[D]emonstrating that all class members are subject to the same harm will suffice." Baby Neal, 43 F.3d at 56.
 
 
 74
 The district court committed legal error (and therefore abused its discretion) by holding that because superficial differences exist between class members, the commonality requirement was not met. The "existence of shared legal issues with divergent factual predicates is sufficient" to meet the commonality requirement of Rule 23(a). Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir.1998).
 
 
 75
 b. Typicality
 
 
 76
 The district court also concluded that the named Plaintiffs' claims are not "typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so ... that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57 (citation omitted). "Typicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Id. at 57-58 (internal quotation marks and citations omitted); see also K.L. v. Valdez, 167 F.R.D. 688, 691 (D.N.M.1996) (holding that "a plaintiff's claim is typical if it arises from the same ... course of conduct ... and ... [is] based on the same legal theory"); Patrykus v. Gomilla, 121 F.R.D. 357, 362 (N.D.Ill.1988) (holding that a "representative's claim is typical if it arises from the same ... practice or course of conduct that gives rise to the claims of the other class members and ... is based on the same legal theory") (internal quotation marks and citation omitted).
 
 
 77
 The above discussion of commonality applies equally to the issue of typicality. The claims of Hodgers-Durgin and Lopez obviously typify those of the class. They simply allege that Border Patrol agents may stop them without reasonable suspicion. Hodgers-Durgin alleges that they may stop her at night, in accordance with the claims of part of the class; and Lopez alleges that they may stop him during the day when they can see his ethnicity, in accordance with the claims of the rest of the class. Thus, the typicality requirement is satisfied.
 
 
 78
 We therefore reverse the district court's denial of class certification and remand so that it can consider the remaining requirements for class certification that it did not address in the first instance.
 
 IV. Conclusion
 
 79
 For the reasons stated above, we reverse the district court's grant of summary judgment, reverse its denial of class certification, and remand for further proceedings.
 
 SNEED, Circuit Judge, Dissenting:
 I respectfully dissent.[1]
 
 80
 The bedrock of my dissent lies in the following declaration from Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), in which a class consisting of prison inmates sought an injunction mandating detailed, systemwide changes in ADOC's[2] prison law libraries and in its legal assistance programs.[3] Id. at 349, 116 S.Ct. at 2179.
 
 
 81
 It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. In the context of the present case: It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur. Of course the two roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered, or that will imminently be suffered, by a particular individual or class of individuals, orders the alteration of an institutional organization or procedure that causes the harm. But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.
 
 
 82
 Id. at 349-50, 116 S.Ct. at 2179.
 
 
 83
 In the case currently before us, class plaintiffs Durgin and Lopez represent an improperly multitudinous class that has neither been actually harmed nor faced with a threat of imminent harm. Thus, the proposed class runs afoul of the dictates of Lewis and its requirement of a threat of imminent harm.
 
 
 84
 Despite the Lewis holding, Durgin and Lopez now seek to represent two groups of uninjured persons, each numbering in the hundreds of thousands, if not millions. Durgin and Lopez describe the classes they seek to represent as follows:
 
 
 85
 ... all persons who have been, are or will be traveling at night by motor vehicle on the highways of the State of Arizona, within the counties of Cochise, Graham, Greenlee, Maricopa, Pima, Pinal, Santa Cruz and Yuma; and all persons who are of Latin, Hispanic or Mexican appearance who have been, are, or will be travelling by motor vehicle on the highways of the State of Arizona, within the counties of Cochise, Graham, Greenlee, Maricopa, Pima, Pinal, Santa Cruz and Yuma.
 
 
 86
 Third Amended Complaint p 12 (emphasis added).
 
 
 87
 A cursory glance at Rule 23 of the Federal Rules of Civil Procedure easily reveals that plaintiffs Durgin and Lopez cannot represent properly each of the individuals embraced in the enormous reach of the two classes described above.
 
 
 88
 First, the two named plaintiffs lack standing to serve as representatives of the proposed class. Class plaintiffs Durgin and Lopez each were stopped once by Border Patrol Agents (possibly, but not certainly, without reasonable articulable suspicion) without being arrested. Past injury, standing alone, is simply an insufficient basis upon which to obtain injunctive relief. To have standing to seek injunctive and declaratory relief Durgin and Lopez must demonstrate a great and immediate threat of future harm. See City of Los Angeles v. Lyons, 461 U.S. 95, 106 n. 7, 103 S.Ct. 1660, 1667 n. 7, 75 L.Ed.2d 675 (1983). Yet the likelihood of future injury to these named plaintiffs is de minimis. The area concerned includes millions of drivers and Durgin and Lopez were stopped only once despite having driven many miles within the class area. This alone deprives Durgin and Lopez of standing to represent the multitude embraced by the above description of the class and is a sufficient basis to dismiss this appeal and direct the district court to dismiss the complaint.
 
 
 89
 Moreover, these classes embrace those who unquestionably were stopped properly on the basis of reasonable articulable suspicion, those who plainly were stopped improperly, and the multitude of both the "Latin, Hispanic or Mexican" appearing drivers, as well as the multitudes whose appearance is otherwise. Although these classes embrace numbers "so numerous that joinder of all members is impracticable," Fed.R.Civ.P. 23(a)(1), there is not sufficient commonality of law or facts in the stops involving each purported class member to satisfy Federal Rule of Civil Procedure 23(a)(2) and (3).[4]
 
 
 90
 The district court properly held that the circumstances surrounding the stops of Durgin and Lopez lacked the required "commonality" and "typicality." While it is true that the legal analysis employed in determining whether a Border Patrol stop is proper is applied to all such stops, it is equally true, as the district court pointed out, that the facts relevant to each stop are different. Of course, certain patterns of behavior are discernible by experienced observers; however, even appellate judges are aware that each case reaching them by reason of a Border Patrol stop is somewhat different from all the others. Each requires a close examination of the facts before either affirming or reversing the judgment of the district court.
 
 
 91
 It follows, therefore, that in this case appellants cannot show that "the party opposing the class has acted, or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Thus, the requirements of Rule 23(b)(2) are not met.
 
 
 92
 Assuming, albeit improperly, that Durgin and Lopez have standing to represent the hundreds of thousands, if not millions, embraced within the class descriptions, it is evident that the purpose of this suit is to secure a judicial order that mandates "the alteration of an institutional organization or procedure that causes the harm" and not the "granting relief against actual harm that has been suffered, by a particular individual or class of individuals." Lewis, 518 U.S. at 349, 116 S.Ct. at 2179, 135 L.Ed.2d 606.
 
 
 93
 The district court properly refused to certify the class and granted summary judgment in favor of defendants. The putative class is fatally flawed and should not be able to proceed.
 
 I.
 
 94
 THE RELEVANCE OF CITY OF LOS ANGELES v. LYONS
 
 
 95
 The two individuals who seek to serve as class representatives of a very large number of drivers urge that the district court oversee the reformation of the allegedly improper practices of the Border Patrol within the designated class area. To establish the need for such reformation, the majority, in an offhand manner, purport to rely on the Border Patrol's "I-44s." Even were the majority's faith well-placed, which it is not, it cannot overcome the institutional limits of the Judiciary in the functioning of our tripartite government. Lewis so teaches us.
 
 
 96
 This effort of the appellants also closely resembles that of the respondent in City of Los Angeles v. Lyons, who sought both damages and injunctive relief after being stopped for a traffic violation by police officers of the City of Los Angeles and being subjected to a "chokehold" which injured his larynx. The Supreme Court properly asked "whether the wrong was capable of repetition, yet evades review," answered in the negative and denied injunctive relief. See 461 U.S. at 109, 103 S.Ct. at 1669, 75 L.Ed.2d 675. To have awarded such relief would have made available the sort of area-wide relief that class plaintiffs seek in this case. To this extent, Lyons cautions against the use of procedural devices, whether injunctions or class actions, to achieve substantial modifications of the police actions of the executive branch of government at both the state and federal level.
 
 II.
 LA DUKE AND NICACIO NOT APPLICABLE
 
 97
 Durgin and Lopez rely heavily on two cases of this circuit to support their position: LaDuke v. Nelson, 762 F.2d 1318 (9th Cir.1985), and Nicacio v. United States INS, 797 F.2d 700 (9th Cir.1985). It is clear that not only are the facts in this case different and less compelling than in LaDuke and Nicacio, but also these cases antedate the Supreme Court's decision in Lewis, although not Lyons.
 
 
 98
 In LaDuke, this court reviewed a district court record far more compelling than the one presently before us when it affirmed a decision enjoining the INS from conducting farm and ranch checks of immigrant housing without warrants, probable cause or articulable suspicion. So different are the facts of LaDuke as to make that decision inapposite here. The district court in LaDuke "explicitly found that the defendants engaged in a standard pattern of officially sanctioned officer behavior violative of the plaintiff's constitutional rights." LaDuke, 762 F.2d at 1324 (citation omitted). Here, the district court below specifically found "no evidence that Border Patrol agents have been authorized by Border Patrol supervisors to utilize impermissible profiles." Durgin v. De La Vina, 174 F.R.D. 469 (D. Ariz.1997). This fact alone renders Durgin and Lopez's attempt to bootstrap their claims onto LaDuke 's holding unpersuasive.
 
 
 99
 In LaDuke, the court also found that the INS initiated regular searches of farm labor housing without warrants, probable cause or articulable suspicion. 762 F.2d at 1321. Again, this case reveals no such invasion of "housing communities" or homes or shelters. This case involves only stops of trucks and cars. Moreover, the testimony of the Border Patrol agents in LaDuke indicated that the agents "never had any specific information in advance (of the search)," and that they often "relied on notoriety or reputation." Id. at 1327 n. 12. In this case, no such finding was made.
 
 
 100
 The district court in LaDuke found that the named plaintiffs had a "personal interest" or personal stake in being protected from improper searches and seizures and that the class had a "personal interest" at the commencement of the litigation. See id. at 1324-25. In determining the existence of such "personal interest," the district court in LaDuke "made a specific finding of likely recurrence." Id. at 1324.
 
 
 101
 Here, on the other hand, neither the named plaintiffs nor the class can make a sufficient "personal interest" showing necessary under the Article III case or controversy requirement. The district court below has made no specific finding that Durgin and Lopez and the class "face a real and immediate threat," Lyons, 461 U.S. at 110, 103 S.Ct. at 1669, 75 L.Ed.2d 675, of being illegally searched.
 
 
 102
 The LaDuke court distinguished the Supreme Court's decision in Lyons on the grounds that it was confronted with state activity whereas in LaDuke, as in this case, the alleged unconstitutional behavior was an instrumentality of the United States. This distinction lacks substance, however. The Fourteenth Amendment, as interpreted in this century, empowers the federal judiciary to protect an individual against a violation by a state, as well as the United States, of the fundamental rights guaranteed by the Bill of Rights. The principles of comity and federalism must yield to that amendment's commands.
 
 
 103
 Nicacio v. INS is closely related in doctrine to LaDuke and again relied upon heavily by Durgin and Lopez in this case. While the facts of Nicacio are closer than LaDuke to the facts of this case, Nicacio nonetheless is too fundamentally different from this case to control our decision.
 
 
 104
 In Nicacio, this court affirmed a district court decision finding INS "stops without a warrant unlawful unless the agents have a 'particularized reasonable suspicion based on specific articulable facts' that a person in a vehicle is an illegal alien." 797 F.2d at 701 (citations omitted). The district court in Nicacio held a bench trial considering the basic issue of whether "persons of Mexican, Latin, or Hispanic appearance" traveling by motor vehicle on the highways of the State of Washington were being stopped without "particularized reasonable suspicion based on specific articulable facts." See Nicacio, 797 F.2d at 701 (internal quotation marks and citations omitted).[5]
 
 
 105
 Based on a wealth of persuasive evidence-primarily the testimony of several INS agents-the trial court in Nicacio concluded that the INS had repeatedly stopped several class members in the absence of reasonable articulable suspicion. See id. at 705-06. One agent, when asked to explain how he determined whether a person was an undocumented alien, testified that it was "hard to just say right off." Id. at 705.
 
 
 106
 The facts of this case are not those of Nicacio, or, as discussed, LaDuke. First, in those cases the district court found an official INS policy of detaining individuals without reasonable articulable suspicion. In this case, the district court specifically found no evidence that Border Patrol agents were authorized by their supervisors to use improper profiles. See 3 CR 106 at p. 5.
 
 
 107
 Second, the reach of the "pattern and practice" in LaDuke and Nicacio was limited-it was confined to a discrete group of individuals where the predominant ethnic group is not Hispanic. This made it more likely that individual class members would suffer future injury. In the present case, the Border Patrol's alleged "pattern and practice" encompasses a large swath of territory and an enormous group of individuals.[6] Thus, even assuming the existence of a "pattern and practice," it is far less likely that any individual class member will suffer future injury.
 
 
 108
 Third, in LaDuke and Nicacio the district court held a bench trial in which it considered the entire record and afforded the INS agents and their supervisors an opportunity to explain the basis upon which their stops were made. Only after complete consideration of the record did the court, based on the totality of the circumstances, find that the agents engaged in a pattern and practice of illegally detaining individuals without reasonable articulable suspicion.
 
 
 109
 In this case, the district court made no such finding. Nonetheless, the majority employs LaDuke and Nicacio to suggest strongly that the practices revealed in those cases were employed by the Border Patrol in the stops of the class plaintiffs in this case. Under that assumption, it rejected the district court's reliance on the fact that the class representatives, Hodgers-Durgin and Lopez, had been stopped only once despite having driven thousands of miles in southern Arizona.
 
 The majority then observes:
 
 110
 A "chain of speculative contingencies" need not occur before the Border Patrol stops the Plaintiffs again. Plaintiffs merely must embark on a routine journey and pass a Border Patrol agent who, pursuant to the alleged pattern and practice decides to stop them for no legitimate reason.
 
 
 111
 See maj. op., p. 674. By this statement, the majority would as likely wager on a horse running at 1000 to one as one whose odds were two to one.
 
 III.
 
 112
 DURGIN AND LOPEZ LACK STANDING TO REPRESENT THE PROPOSED CLASS
 
 
 113
 The majority fails to adequately address the issue of the standing of Durgin and Lopez to represent the interests of the proposed class. Durgin and Lopez do not present "questions of law or fact common to the class," Fed.R.Civ.P. 23(a)(2), nor do they present claims "typical of the claims ... of the class," Fed.R.Civ.P. 23(a)(3). The district court, therefore, properly denied class certification.
 
 
 114
 No I-44 is prepared for the type of stop in which the class plaintiffs were involved. I-44s are only prepared when contraband, including illegal aliens, are discovered as a result of a stop.[7] This fact gravely impairs, if not completely destroys, the standing of class plaintiffs Durgin and Lopez to represent those whose stops led to the preparation of an I-44. Their only injury was to be inconvenienced by delay and perhaps to experience a sense of exasperation. Class actions, such as those authorized by Rule 23 of the Federal Rules of Civil Procedure, are not a proper vehicle for an uninvolved or unharmed good citizen to correct the possible abuses of power by public authorities. Kolender v. Lawson, 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983), is instructive. There the Supreme Court analyzed whether plaintiffs had standing to seek declaratory and injunctive relief with respect to an allegedly unconstitutional state statute. The Supreme Court stated:
 
 
 115
 We note that Lawson has been stopped on approximately 15 occasions pursuant to § 647(e), and that these 15 stops occurred in a period of less than two years. Thus, there is a "credible threat" that Lawson might be detained again under § 647(e).
 
 
 116
 Only one stop, whether proper or not, apparently suffices for the majority.
 
 
 117
 Durgin and Lopez are therefore not proper class representatives of those for whom stops resulted in discovery of contraband leading to either a return to Mexico or prosecution for smuggling. The "claims or defenses" of Durgin and Lopez are not "typical of the claims or defenses of the class" they seek to represent. Fed.R.Civ.P. 23(a)(3). They did nothing wrong; no defense is needed. The record indicates that no I-44 was prepared with respect to their stops.[8] Those for whom I-44s were prepared, numbering in the thousands, can make no such showing. They were doing something against the laws of the United States. It also follows that "the party opposing the class," De La Vina, et al., has not acted against Durgin and Lopez "on grounds generally applicable to the class" that they seek to represent. Fed.R.Civ.P. 23(b)(2). Those whom Durgin and Lopez seek to represent have an interest in defeating prosecution for their wrongs. Durgin and Lopez have no such interest. Their general public concern about stops by the Border Patrol and their inconvenience arising from a single stop does not make them proper representations of the class.
 
 IV.
 THE MANAGEABILITY OF THE PROPOSED CLASS
 
 118
 LaDuke and Nicacio arose within a social, economic, and geographic situation quite different from that of this case. In those cases, Hispanic workers traveled long distances to secure seasonal work in the agricultural sector of the northwestern states. The predominant ethnic group in that area is not Hispanic. These circumstances contributed significantly to the Border Patrol's readiness to disregard the constitutionally-required procedures in making stops of vehicles in which Hispanic farm workers were traveling. Such workers were easily recognized. Border Patrol agents, as a result, frequently, albeit improperly, assumed that any Hispanic person on the highway during the agricultural season was an illegal alien.
 
 
 119
 These circumstances also contributed to the manageability of the class actions in these cases. The focus of the litigation could be upon a non-indigenous group consisting of seasonal Hispanic agricultural workers largely centered in a confined area. No such adequate spatially and ethnically limiting circumstances exist in this case. Hispanic-appearing people are a large portion of the population of the southern half of Arizona. Of course illegal Hispanic workers exist in Arizona but a large number who perhaps so appear are citizens of the United States.
 
 
 120
 The majority, to repeat, creates a class of an indefinite number consisting of all the Hispanic-appearing persons (both legal and illegal) who drive in the day and all drivers, whatever their appearance, who drive at night. The geographic area embraced by this action extends over approximately one half of the State of Arizona with a population of approximately three million.
 
 
 121
 This bifurcated class, embracing much of that population could not function in a manner consistent with the structure of Rule 23 of the Federal Rules of Civil Procedure. For example, the required notice to class members necessarily would be by publication throughout the area. Live testimony perhaps would be limited to a few, perhaps a score or more of the alleged multitude who have been improperly stopped, drawn from the different counties embraced within the class region. The U.S. Department of Justice, representing the Border Patrol, would probably respond by setting forth its statistics of appropriate stops that led to the discovery of the contraband. In doing so it would point to the I-44s in support of its practices, but which, to repeat, do not exist for stops, whether proper or not, in which no contraband was discovered. This fact, to again repeat, makes any reliance by the majority on the existence of the I-44s to make the proposed class action more manageable largely a false hope. As a consequence, large numbers of persons, allegedly stopped improperly when no contraband was discovered, very likely would be deposed and their testimony offered for inclusion in the record. Anything less would not serve the purposes of the action that the representatives of the class contemplate. At some point agents and officials of the Border Patrol would be summoned to testify about their practices and attempts would be made to refute their testimony with incomplete I-44s. This is not a class action that will be easily managed nor will the I-44s reveal complete or reliably accurate information.
 
 V.
 THE TRUE NATURE OF I-44S
 
 122
 Durgin and Lopez incorrectly insist that the class is so numerous "that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). This suggestion, to repeat, is based on the assertion that the I-44s need only be examined to establish that the Border Patrol does not adhere to constitutionally required procedures in its stops and searches of cars and trucks. This is an incorrect assumption.
 
 
 123
 I-44s are prepared by an official of the Border Patrol other than the officer who made the particular stop in which contraband was discovered. They well may be both incomplete and unreliable. The record of this case quite candidly describes the difficulty in preparing official experiences in attempting to obtain from the arresting officer a full and accurate description of the circumstances that prompted the officer to make the stop. Patrolling officers of the Border patrol are often not fluent writers of English, even though their skills at recognizing smuggling when they see it may be quite sharp.[9] Nonetheless, the Border Patrol exerts specific and continuing efforts to improve the performance of its officers in all respects. Vol. 4, U.S. Dist. Ct. Az. Tabs 5-11.
 
 
 124
 I-44s are intended only to serve the purpose of notifying other agencies, such as the INS, of the stop and to convey certain information pertaining to it.[10] They do not purport to be a complete account of all the circumstances surrounding the stop.
 
 
 125
 I-44s, to repeat, are not legal briefs. They are not intended to demonstrate the presence of reasonable articulable suspicion in future court proceedings. They contain only a brief description of a stop that yielded contraband directed to the agency concerned such as the INS or the DEA. It is true that they do contain statements that appear frequently such as "the driver did not look at the agent," the car or van "appeared heavy in the rear," and the "driver gripped the steering wheel and refused to look at me." On the other hand, they also contain statements such as "As I pulled along side, I saw bodies lying in the rear of the car," and "the car did not exhibit any license plates," neither of which appear too frequently.
 
 
 126
 However, an experienced agent is alert to certain patterns of behavior which he has observed frequently and which in the past has led to the detection of smuggling. These patterns, while consisting of multiple stimuli, to his experienced eye strongly suggest the presence of smuggling. There is nothing strange or unusual about this phenomena.
 
 
 127
 Football and basketball officials exhibit the same perception in their areas of work. They "see" things that the untrained eye does not. The crowd may howl, but they are usually right. The truth is that it is the context within which a particular feature appears that determines its meaning, relevance or force to the observer. Any musician, artist, writer, or, to repeat, any sports official knows this. Moreover, every experienced driver of an automobile has suddenly sensed the need to alter the existing pattern of driving because of the awareness of danger quite difficult to articulate precisely after the event. We merely call that "good driving."
 
 
 128
 The psychology behind these phenomena has long been known as "gestalt psychology." Multiple stimuli within a fixed space and time create an impression distinct from those of its separate parts. See Barbara A. Chernow & George A. Vallasi, The Columbia Encyclopedia 1077 (Columbia Univ. Press 5th ed.1993); The New Encyclopedia Britannica vol. 5, at 227 (15th ed.1998). Thus, it proves little to dissect a given stop set forth on an I-44 by the Border Patrol, and thereafter to conclude, because no single element amounts to reasonable articulable suspicion, that such could not exist. The observer's mind and senses do not function that way. The observer, of course, must recall certain features of his experience for judicial purposes; however, for the same purpose judges must not ignore the teaching of "gestalt psychology."
 
 VI.
 CONCLUSION
 
 129
 This action is, to repeat, an effort to initiate an investigation of the practices of the Border patrol by private parties.[11] I return to Lewis v. Casey. Is a class action proceeding of this nature a proper function of the Judiciary? I submit that the proposed class action in this case is even less deserving that was that which was rejected by the Supreme Court in Lewis. The proper branches of government to manage the activities of the Border Patrol in southern Arizona are the Executive and Legislative branches, not the Judiciary. By granting injunctive relief, this Court has effectively usurped the managerial and supervisory functions of the political branches.
 
 
 130
 Protection of the borders of the United States from smuggling and illegal entries by foreign nationals is the primary responsibility of the Executive, while oversight of these functions is the responsibility of Congress. The Judiciary's responsibility is, as stated in Lewis v. Casey, "... to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm...." 518 U.S. at 349, 116 S.Ct. at 2179, 135 L.Ed.2d 606. In this case the named plaintiffs, while perhaps suffering slight harm, seek little or no personal relief but only an investigation and possible reform of the practices and policies of the Border Patrol in southern Arizona. To yield to their request would compromise the fundamental principles of the doctrine of Separation of Powers. Therefore, I vigorously dissent.
 
 VII.
 RESPONSE TO MAJORITY'S FOOTNOTES
 
 131
 Although an unusual measure, I feel compelled to respond to the majority's criticisms of my dissent, point by point. I begin with three general observations. First, the majority does not afford proper deference to the Lyons opinion, which I believe controls the disposition of the standing issue. Durgin and Lopez have encountered the Border Patrol once each; they provide no evidence in the record to indicate that there was even a remote chance that the Border Patrol would again subject them to another stop without reasonable articulable suspicion. Based on the record, we cannot confer standing upon them. They travel a highway which encompasses eight counties, serves a population by three million individuals and spans half the State of Arizona. Because Durgin and Lopez have "made no showing that [they are] realistically threatened by a repetition of [their] experience ... [they have] not met the requirements for seeking an injunction in federal court, whether the injunction contemplates intrusive structural relief or the cessation of a discrete practice." Lyons, 461 U.S. at 109, 103 S.Ct. at 1669, 75 L.Ed.2d 675.
 
 
 132
 Second, the majority makes much ado about the fact that Durgin and Lopez do not have the benefit of a well developed record. In my opinion, that's much ado about nothing. Like every litigant, Durgin and Lopez had the opportunity to develop the record at the class certification and summary judgment stages, yet they failed to take advantage of that opportunity. It is not our job to ask: "What if counsel did a better job in preserving the record?" rather, we must examine the record as it is. Durgin and Lopez have to work with the record as preserved by their trial counsel, no matter how good or bad.
 
 
 133
 Finally, and perhaps most importantly, is the message that the majority conveys in its opinion. The majority apparently condones, based upon two stops of two individuals, a massive investigation and probable oversight of the activities of the Border Patrol. The majority signals this Court's willingness to micromanage other branches of government based upon an inclination not supported by a factual record-a clear breach of the Separation of Powers principle.
 
 
 134
 It is unfortunate, but where the incidence of crime is high, some innocent individuals will be suspected. That is the price that the high rate of crime has placed on our society. The majority apparently rather would embrace chaos.
 
 I now turn to the particulars:
 Footnote 2:
 
 135
 My discussion of gestalt psychology does not abrogate the rule of reasonable articulable suspicion. It merely explains that specific perceptions impart meaning to the viewer or listener and from that mixture comes meaning and a total perception. I by no means imply that gestalt psychology satisfies reasonable articulable suspicion.
 
 Footnote 3:
 
 136
 The majority misses the forest for the trees in its examination of I-44s. I simply note that a mere examination of I-44s does not get you far. They do not reflect the entire truth of every stop. More importantly, the forms are not intended to record the details of every stop or to record the elements of reasonable articulable suspicion. I-44s are intended only to serve the purpose of notifying other agencies of the stop and to convey certain information pertaining to it.
 
 
 137
 That some phrases in some I-44s mirror each other does not mean much. Of course an individual who is required to follow a form, time and time again, will use the same phrase over and over. As judges, we're all familiar with the phrase: "We have jurisdiction pursuant to § 1291, and affirm." The fact that it appears in a great number of opinions does not, in and of itself, mean that the conclusion is false. Legal writing, like preparing I-44s, is not always an exercise in original thought.
 
 Footnote 7:
 
 138
 If statistical probabilities are not relevant in determining standing, why should even one stop be required? Perhaps the majority would argue that an Arizona driver who never had been stopped would have standing to bring this suit.
 
 Footnote 8:
 
 139
 Unfortunately for Durgin and Lopez, the record is not developed sufficiently to make the leap that the majority suggests we make. The record only provides that the two named plaintiffs were stopped once each. This alone does not justify a massive investigation into the Border Patrol's activities. See Lyons, 461 U.S. at 109, 103 S.Ct. at 1669, 75 L.Ed.2d 675.
 
 
 140
 The majority inappropriately presupposes that Durgin and Lopez can establish a pattern of improper conduct. There is no such evidence and plaintiffs should not be allowed to engage in massive discovery to "uncover" this alleged pattern.
 
 
 141
 The evidence in this case merely demonstrates that the named plaintiffs were each stopped once. Construe those facts as strongly as one likes, they do not establish, or even suggest, an unlawful pattern and practice. The majority's imagination or, at best, suspicion, is being relied on to remedy the deficiencies of the pleadings.
 
 Footnote 9:
 
 142
 I agree that the record in LaDuke was stronger. First, plaintiffs here had the opportunity to develop a stronger record and failed.
 
 
 143
 Second, Judge Roll concluded that plaintiffs presented "no evidence that Border Patrol agents have been authorized by Border Patrol supervisors to utilize impermissible profiles" despite repeated concerns of the district court. See Durgin v. De La Vina, 174 F.R.D. 469 (D. Ariz. 1997). The district court held that the case did not deserve to proceed to a bench trial because plaintiffs failed to present any evidence to support their allegations. Suspicion of a "passively tolerated pattern" is not enough. Nor is it proper at the summary judgment stage to accept plaintiffs' claims on the grounds that the "missing pieces" of these claims will turn up during the trial. To so proceed would defeat the purpose of the summary judgment procedure. Full discovery by the parties prior to summary judgment, with such proper amendments of the complaint as discovery permits, is the proper procedure. The failure of the plaintiffs in this case to state a cause of action entitles the defendants to summary judgment.
 
 
 144
 Third, I never suggested that "stops of cars and trucks" do not deserve Fourth Amendment protection or are "unworthy of judicial redress." I am sure that the majority is aware that the Fourth Amendment shield affords greater protections for an individual's home than his car or truck. Compare Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (search of house) with Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (search of automobile).
 
 
 145
 Fourth, I have not suggested that we disregard relevant precedent. I merely pointed out that in the framework of LaDuke and Nicacio, the distinction between state and federal enforcement activities did not alone control the outcome of those cases. Where the plaintiffs in this case have failed to establish: (1) "a likelihood of recurrent injury," LaDuke, 762 F.2d at 1324; (2) "a standard pattern of officially sanctioned officer behavior," id.; and (3) "the requisite personal stake" in the outcome of the litigation, id. at 1325; the mere fact that we are dealing with federal, rather than state, law enforcement "lacks substance."
 
 
 146
 It is the majority, not the dissent that seeks to cast aside relevant precedent. The majority "ignores and brushes aside" the Supreme Court's dictates in Lewis v. Casey: "It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." 518 U.S. at 349, 116 S.Ct. at 2179, 135 L.Ed.2d 606. To repeat, Durgin and Lopez have not presented a record to support judicial intervention with the Border Patrol-they have not demonstrated adequate harm. For that reason, the action must fail.
 
 Footnote 10:
 
 147
 Again, I concur with Judge Roll's conclusion that plaintiffs did not and cannot, on the record, establish an unlawful pattern or practice by the Border Patrol. See Durgin v. De La Vina, 174 F.R.D. 469 (D.Ariz.1997). The majority once more acknowledges plaintiffs have not stated a claim and asserts the plaintiffs might do so in a trial. That simply is not enough to survive summary judgment.
 
 Footnote 11:
 
 148
 I again contend that the Supreme Court's decision in Lyons remains applicable and resembles the facts of this case closely. Under Lyons, a plaintiff must make a "showing that he is realistically threatened by a repetition of his experience." 461 U.S. at 109, 103 S.Ct. at 1669, 75 L.Ed.2d 675. Why is it necessary that repetition of being stopped depends on being stopped properly? Being stopped, properly or not, would enable the police to use the chokehold.
 
 
 149
 Lyons said it was petitioner's failure to show that he faced a likelihood of being stopped, improperly or properly, that fatally flawed his claim. Here, it is Durgin and Lopez's failure to demonstrate a likelihood of being stopped again by the Border Patrol that fatally flaws their case. This deficiency cannot be supplied by merely pleading "a pattern of unconstitutional stops." Evidence that supports the existence of this pattern is necessary.
 
 
 150
 The pleading difficulties which the plaintiffs encounter underscore the wisdom of Lewis v. Casey, supra.
 
 Footnote 12:
 
 151
 Again, the majority proposes that Durgin and Lopez can place the Border Patrol in judicial receivership merely because they were each stopped once. Lewis prohibits this.
 
 
 152
 The majority applies Lewis incorrectly. To repeat, assuming that Durgin and Lopez have standing (i.e., that they have established "actual injury"), Lewis requires us to ask whether there is such a systemwide deficiency to justify a federal court's decision to intervene, alter "an institutional organization or procedure," and impose "systemwide relief." 518 U.S. at 349, 359, 116 S.Ct. at 2179, 2184, 135 L.Ed.2d 606.
 
 Footnote 16:
 
 153
 Notwithstanding the majority's assertions to the contrary, the record clearly demonstrates the true nature of the I-44 forms. I-44s are used by the Border Patrol to provide information to other agencies. "An I-44 is conducted when you're turning it over to someone else or you want to report something to the chief of a detainment for prosecution. For prosecution an I-44 is not utilized." 3 CR at 85 (Deposition of Alfredo Casillas). I rest my conclusion regarding the I-44s upon the evidence presented to this Court, as reflected by the record.
 
 Footnote 17:
 
 154
 Again, I contend that the I-44s cannot be relied upon by the named class representatives because no I-44 was prepared for the type of stops in which class plaintiffs were involved-they are only prepared when contraband is discovered. As a result, class plaintiffs do not satisfy the dictates of Federal Rule of Civil Procedure 23.
 
 
 155
 We conclude where we began. No system of highway surveillance can ensure that the Border Patrol only stop the guilty. To condemn, as the majority does, stops of the innocent is to condemn the system, which is designed to, and does to some degree, enforce the law.
 
 
 156
 Plaintiffs attempt to use this class action as a vehicle to condemn the Border Patrol-an agency within the executive branch of government-an attempt which the majority apparently embraces. Class actions do not, however, provide courts with an opportunity to usurp the functions of the political branches-particularly where there is no basis for such a remedial decree in the first place. As the head of our own branch reminds us, "[c]ourts have no power to presume and remediate harm that has not been established." Lewis, 518 U.S. at 361, n. 7, 116 S.Ct. at 2185 n. 7, 135 L.Ed.2d 606.
 
 
 
 *
 Honorable John S. Rhoades, Sr., Senior United States District Court Judge for the Southern District of California, sitting by designation
 
 
 [1]
 Defendants do not dispute the facts of this incident but, curiously, characterize Lopez as "engag[ing] in evasive maneuvers with his vehicle--moving in and out of traffic lanes--for the apparent purpose of avoiding a Border Patrol agent." (Opp'n Br. at 33.)
 
 
 [2]
 We have long held that "[i]mmigration agents on a roving patrol may stop a vehicle only when they have a reasonable suspicion based on specific and articulable facts that the vehicle contains aliens who may be illegally in this country." Nicacio, 797 F.2d at 702 (emphasis added); see also United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); United States v. Medina-Gasca, 739 F.2d 1451, 1453 (9th Cir.1984); United States v. Ogilvie, 527 F.2d 330, 331 (9th Cir.1975). The dissent seems to argue for the abrogation of this principle. Although it gives lip service to the fact that "an officer must recall certain features of his experience for judicial purposes," the dissent urges us to rely on "gestalt psychology," and implies that an officer's subjective feelings and hunches can satisfy the reasonable-suspicion standard. Whatever merit "gestalt psychology" may have, we cannot disregard settled law and ignore the requirement of specific and articulable facts
 
 
 [3]
 The dissent states that because the I-44s are prepared only when contraband is found and that since no contraband was found when Durgin and Lopez were stopped, that the class standing of Durgin and Lopez is impaired if not destroyed. The dissent's conclusion suggesting that only persons who do in fact have contraband have standing to determine the constitutionality of the Border Patrol's action is erroneous. Whether contraband is found or not does not determine whether the stop is constitutionally permitted or whether the I-44s are evidence of a pattern and practice
 Moreover, the dissent states that "[i]t is unfortunate, but where the incidence of crime is high, some innocent individuals will be suspected. That is the price that the high rate of crime has placed on our society. The majority apparently would rather embrace chaos." The dissent's mistaken conclusion ignores the fundamental truth that the determination of constitutional limitations should never rest on the social or the criminal climate of the times but must rest on whether the Constitution has been violated.
 Furthermore, the dissent states that "[i]t is true that [the I-44s] do contain statements that appear frequently such as 'the driver did not look at the agent' ... and the 'driver gripped the steering wheel and refused to look at me.' " The dissent's characterization is misleading. Many of the I-44s contain more than just similar phrases; many duplicate each other verbatim in every respect, except for such details as the time of day. This goes far beyond a few "statements that appear frequently."
 
 
 [4]
 The Complaint was amended three times, during which various parties were added and dropped. Lopez did not become a party until the Third Amended Complaint
 
 
 [5]
 Specifically, Plaintiffs defined the class as
 all persons who have been, are, or will be traveling at night by motor vehicle on the highways of the State of Arizona, within the counties of Cochise, Graham, Greenlee, Maricopa, Pima, Pinal, Santa Cruz and Yuma; and all persons who are of Latin, Hispanic or Mexican appearance who have been, are, or will be traveling by motor vehicle on the highways of the State of Arizona within the [above-listed] counties....
 (3d Am.Compl.p 12.)
 
 
 [6]
 The district court properly construed the Motion to Dismiss as a motion for summary judgment because in arguing the motion, both parties relied on information outside the pleadings. See Grove v. Mead Sch. Dist., 753 F.2d 1528, 1532-33 (9th Cir.1985)
 
 
 [7]
 The dissent also rests its analysis on purely statistical probabilities by stating: "The area concerned included millions of drivers and Durgin and Lopez were stopped only once despite having driven many miles within the class area. This alone deprives Durgin and Lopez of standing...."
 
 
 [8]
 The dissent reads our opinion as "suggest[ing] strongly" that the Border Patrol engages in an unlawful pattern and practice. We intend no such implication on this ultimate issue. We merely conclude that construing the evidence in the light most favorable to Plaintiffs that Plaintiffs have established that an unlawful pattern and practice exists
 
 
 [9]
 The dissent attempts to distinguish LaDuke on several bases. First, it notes that LaDuke involved officially sanctioned unlawful behavior. The dissent apparently believes that the officially sanctioned pattern made it more likely that a particular plaintiff would suffer future injury. We cannot agree; a passively tolerated pattern (indeed, even an officially discouraged pattern) can violate a person's rights as readily as an officially sanctioned one. The question is not whether Border Patrol supervisors sanction the alleged unlawful pattern. The question is whether evidence exists in the record from which Plaintiffs may be able to establish that a pattern exists
 Second, the dissent argues that LaDuke arose on a "far more compelling" record. The dissent references various findings that the district court made in LaDuke--findings that are absent here. For instance, the dissent notes that the district court in the present case has not found that the agents "never had any specific information in advance" of a stop or that "the agents engaged in a pattern and practice of illegally detaining individuals." The dissent's distinction is misplaced because LaDuke arose on appeal following a bench trial, at which the district court had the opportunity to make such findings. The district court in the present case has had no such opportunity, and the dissent would deny it that opportunity. At the summary judgment stage, we cannot expect a record as strong as that in LaDuke; it is settled law that a plaintiff need not "establish" standing at the summary judgment stage; the plaintiff merely must raise a triable issue of fact on the matter. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130. The dissent ignores this principle, preferring to weigh each piece of evidence and draw the inferences it thinks proper. That, of course, is not our task. Our task is to construe all evidence in the light most favorable to Plaintiffs.
 Third, the dissent notes that, unlike LaDuke, the present "case involves only stops of trucks and cars." If the dissent is suggesting that violations of motorists' Fourth Amendment rights are unworthy of judicial redress, we disagree.
 The dissent attempts to escape the force of LaDuke on a fourth ground. It correctly notes that we found standing in LaDuke partly because, as here, the defendants were federal law enforcement agents, as opposed to state agents. See LaDuke, 762 F.2d at 1324 (noting the "absence of ... prudential limitations circumscribing federal court intervention in state law enforcement matters"). The dissent writes that "[t]his distinction lacks substance." Even if we agreed with the dissent--which we do not, for the reasons stated in LaDuke--we do not have the luxury of simply casting aside relevant Ninth Circuit precedent.
 
 
 [10]
 Given the testimony and evidence discussed above, we do not understand how the dissent can claim that the "class ... has neither been actually harmed nor faced with a threat of imminent harm." Absent a trial on the merits, the dissent cannot know this, and neither can we
 
 
 [11]
 The dissent relies on City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), in which a person subjected to a police chokehold on one occasion sought to enjoin the Los Angeles Police Department from ever using the chokehold restraint. The Supreme Court held that the plaintiff could not establish that he was likely to experience the chokehold again, and therefore could not establish standing
 The dissent's reliance on Lyons ignores and brushes aside the facts of that case. To be subject to the chokehold again, Lyons would have to be stopped--an unlikely occurrence to begin with. Lyons did not allege that the police engaged in a pattern of stopping motorists unlawfully. Thus, his claim largely depended on him being stopped properly. Whether he would be properly stopped very well may have depended on him engaging in suspicious or criminal behavior--a speculative contingency. Thus, a speculative traffic stop was an absolute prerequisite to him experiencing another chokehold.
 Moreover, even if he could have shown that he would be stopped, it simply strained credibility to argue that the police would apply a chokehold without any provocation. At bottom, then, Lyons' claim depended on a chain of speculative contingencies.
 In the case at bar, Plaintiffs allege a pattern of unconstitutional stops. Unconstitutional stops are themselves the injury. Thus, in stark contrast to Lyons, Plaintiffs' claims depend not on a chain of speculative contingencies, but on the simple collision of unremarkable behavior and the alleged pattern and practice.
 
 
 [12]
 We agree with the dissent that courts must not "usurp[ ] the managerial and supervisory functions of the political branches." We therefore agree that "[t]he Judiciary's responsibility is [limited] ... 'to providing relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm....' "
 We disagree, however, with the dissent's application of these principles to the case at bar. While the dissent relies on Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) as its "bedrock," a careful reading of that case belies such reliance. In Lewis, the Court held that an inadequate prison law library did not itself constitute an "actual injury" sufficient for standing, thus permitting a prisoner to sue. Id. at 351, 116 S.Ct. 2174. Rather, the Court determined that because access to such facilities is not a Constitutional right in itself, an inmate must go "one step further" and demonstrate that denial to these facilities caused him actual injury by hindering his efforts to pursue a legal claim. Id.
 However, Lewis is clearly distinguishable from the present case. In the present case, Plaintiffs allege that they have, and will be, subjected to unconstitutional stops. An individual's right to be free from such stops is a Constitutional right, recognized in and of itself, under the Fourth Amendment. Thus, Plaintiffs need not "go one step" further and demonstrate additional injury.
 
 
 [13]
 Some of the quoted language is taken from the district court's discussion of typicality, but it applies equally to the issue of commonality. See General Tel. Co. v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge")
 
 
 [14]
 Plaintiffs allege that the Border Patrol stops motorists based solely on race and presence in southern Arizona, or on other innocuous factors such as lack of eye contact with agents, "blank looks," etc. This Court has denounced reliance on such factors. See Garcia-Camacho, 53 F.3d at 247-48 (holding that lack of eye contact "can no longer be accorded any weight" and holding that "agents may not [commence traffic stops] simply because they do not like the look on the occupant's face"); Nicacio, 797 F.2d at 703 (holding that "Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle")
 
 
 [15]
 The district court in Nicacio certified a class defined as "[a]ll persons of Mexican, Latin, or Hispanic appearance who have been, are, or will be traveling by motor vehicle on the highways of the State of Washington." Nicacio, 797 F.2d at 701. The Nicacio court did not, however, have a second class of nighttime travelers
 We affirmed the district court's grant of declaratory and injunctive relief in Nicacio. We did not, however, address the class certification issue.
 
 
 [16]
 This official memorandum belies the dissent's assertion that the I-44s "are not intended to demonstrate the presence of reasonable articulable suspicion in future court proceedings."
 
 
 [17]
 The dissent further challenges our reliance on the I-44s by noting that Border Patrol agents prepare them only when an arrest or seizure follows a stop. The dissent argues that the I-44s therefore do not constitute proof applicable to the class members--people who were not arrested and who did not have property seized. The dissent's argument is unpersuasive. If Border Patrol agents frequently stop criminals without reasonable suspicion, surely they likewise stop innocent motorists without reasonable suspicion. Similarly, if the agents adhere to the Constitution when they stop criminals, it makes sense to conclude that they probably adhere to it when they stop the innocent
 
 
 [18]
 The Supreme Court may have partially overruled the broad holdings of Rochford and cases like it in General Telephone Co. v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In Falcon, the Court held that a named plaintiff complaining of a particular employment practice (failure to promote) ordinarily cannot represent a class complaining of a different practice (failure to hire), even if both complaints stem from the same racially discriminatory policy. See Jordan v. County of Los Angeles, 713 F.2d 503, 504 (9th Cir.) (explaining Falcon ), as amended, 726 F.2d 1366 (9th Cir.1984). Thus, to the extent that the class members in Rochford complained of very different practices, Rochford may not remain good law
 In Falcon, however, the Supreme Court noted that such a broad class could be maintained if a "general policy of discrimination" affects differently situated class members "in the same general fashion." Falcon, 457 U.S. at 159 n. 15, 102 S.Ct. 2364. In the present case, all class members complain of the same type of injury. Rochford therefore provides valid guidance in the present case.
 
 
 [1]
 Although an unusual measure, I respond to the majority's criticisms of this dissent, infra, section VII
 
 
 [2]
 Arizona Department of Corrections
 
 
 [3]
 Class plaintiffs in Lewis alleged that prison authorities furnished them with inadequate legal research facilities in violation of the Constitution. See Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (setting forth requirements for prison law research facilities)
 
 
 [4]
 Federal Rule of Civil Procedure 23(a) reads as follows:
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all numbers is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 [5]
 The class was made up of "[a]ll persons of Mexican, Latin, or Hispanic appearance who have been, are, or will be travelling by motor vehicle on the highways of the State of Washington." See Nicacio, 797 F.2d at 701 (internal quotation marks and citations omitted)
 
 
 [6]
 The 1990 census indicates that there are nearly three million residents in the eight counties making up the plaintiffs' proposed classes
 
 
 [7]
 Deposition of Robert C. Cole, 3 CR 98 at p. 81
 
 
 [8]
 See discussion infra Parts IV and V
 
 
 [9]
 See Deposition of Thomas M. O'Leary, 3 CR at 86
 
 
 [10]
 See Blank I-44 form, 3 CR at 86
 
 
 [11]
 Deposition of Ronald E. Sanders, 4 CR, Tab 12, clearly reveals the far-ranging nature of the inquiry this action contemplates