Diana DOE, By and Through her parent and next friend, A. DOE; Jose Doe, By and Through his parent and next friend, J. Doe; Antonio Doe, By and Through his parent and next friend, L. Doe; Jonathan Does, By and

Through his parent and next friend, M. Doe; Sharon Doe, Joseph Doe and Ruben Doe, By and Through their next friend Y. Doe; Nancy Doe, By and Through her next friend, R. Doe; individually and on behalf of all those similarly situated, Plaintiffs,

v.

LOS ANGELES UNIFIED SCHOOL DISTRICT; Ruben Zacarias, in his official capacity as the Superintendent of the Los Angeles Unified School District, Defendants.

No. CV 98–6154 LBG RZX.

United States District Court, C.D. California.

April 23, 1999.

Theresa Fay–Bustillos, Thomas A Saenz, Silvia Argueta, Antonia Hernandez, Maribel S Medina, Mexican American Legal Defense & Education Fund, Los Angeles, CA, Mark D Rosenbaum, Rocio De Lourdes Cordoba, ACLU Foundation of Southern California, Los Angeles, CA, for Diana Doe, Jose Doe, Antonio Doe, plaintiffs.

Bradley Stuart Phillips, Vilma S Martinez, Munger Tolles & Olson, Los Angeles, CA, Hojoon Hwang, Munger Tolles & Olson, San Francisco, CA, for Los Angeles United School District, Ruben Zacarias, defendants.

Theresa Fay–Bustillos, Silvia Argueta, Antonia Hernandez, Mexican American Legal Defense & Education Fund, Los Angeles, CA, Mark D Rosenbaum, Rocio De Lourdes Cordoba, ACLU Foundation of Southern California, Los Angeles, CA, for Jonathan Doe, Sharon Doe, Joseph Doe, Ruben Doe, Nancy Doe, plaintiffs.

## ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

BAIRD, District Judge.

## I. INTRODUCTION.

On June 2, 1998, the California electorate adopted Proposition 227, a state initiative that restricts the use of bilingual education in public schools to teach students that are limited in English proficiency. On July 30, 1998, plaintiffs filed the instant suit that challenges the validity of the proposition on federal statutory grounds. Plaintiffs currently move to certify a class to include,

> All current and future public school children who are enrolled or who will be enrolled in the Los Angeles Unified School District, who have language barriers that impede their equal participation in the District's instructional programs and have been designated as limited English proficient ("LEP") students.

Defendants Los Angeles Unified School District and Ruben Zacarias, Superintendent of the Los Angeles Unified School District, oppose the motion. Upon careful consideration of the moving papers, the opposition, the reply, and oral argument, the Court certifies plaintiffs' proposed class.

## II. PROPOSITION 227.

Carrying sixty-one percent of the California voters' support, Proposition 227's general aim is to require California public schools to abandon bilingual education programs, which the district widely employed prior to the adoption of the initiative. Under these programs, limited English proficiency ("LEP") students received English language instruction but learned other academic subjects in their primary language until they developed a proficiency in English. Proposition 227 mandates that LEP students shall receive, at the most, one year of English immersion education before integration into classrooms limited to instruction in English.

Titled "English Language Education for Immigrant Children," the proposition is codified at California Education Code, Sections 300 through 340. Cal. Educ.Code §§ 300–40 (West Supp.1999). Section 300 expresses the voters' intent in adopting Proposition 227. *See* Cal. Educ.Code § 300. Proclaiming English as "the leading world language for science, technology, and international business" and the "language of economic opportunity," Section 300 finds that "[t]he public schools of California currently do a poor job of educating immigrant children," and "high drop-out rate[s]" and "low English literacy levels" exist among immigrant children. Cal. Educ.Code §§ 300(a), (d). Based upon these and similar findings, the Section concludes with the declaration that "all children in California public schools shall be taught English as rapidly and effectively as possible." Cal. Educ.Code § 300(f).

Implementing this general aim, Section 305 sets forth limits on teaching bilingual education in the classroom. *See* Cal. Educ.Code § 305. The proposition requires that all "English learners shall be educated through 'sheltered English immersion' programs for a period of not more than one year." Cal. Educ.Code § 305. These programs are defined as "an English language acquisition process for young children in which nearly all classroom instruction is in English but with curriculum and presentation designed for children who are learning the language." Cal. Educ.Code § 306. Under this program, children "shall be taught English by being taught English." Cal. Educ.Code § 305. Once a student completes the immersion program, acquiring a working knowledge of English, "they shall be transferred to English language mainstream classrooms." Cal. Educ.Code § 305.

Sections 310 and 311 provide for a waiver of Section 305, upon consent of the child's parent or legal guardian. *See* Cal. Educ.Code §§ 310–11. A school may excuse a child from the program set forth in Section 305 upon a showing that: (1) "the child already possesses good English language skills"; (2) "the child is age 10 or older, and it is the informed belief of the school principal and educational staff that an alternate course of educational study would be better suited to the child's rapid acquisition of basic English language skills;" or (3) "the child has such special physical, emotional, psychological, or educational needs that an alternate course of educational study would be better suited to the child's overall educational development." Cal. Educ.Code § 311. To obtain a waiver, a parent or guardian must visit the child's school personally, review the education materials used by different "program choices," and examine "all the educational opportunities available to the child." Cal. Educ.Code § 311. If the school grants a waiver, it must move the child to a classroom that utilizes bilingual education techniques or other approved methodologies. *See* Cal. Educ.Code § 310. "Individual schools in which 20 pupils or more of a given grade level receive a waiver shall be required to offer such a class; otherwise they must allow the pupils to transfer to a public school in which such a class is offered." Cal. Educ.Code § 310.

Section 330 states that "[t]he initiative shall become operative for all school terms which begin more than sixty days following the date on which it becomes effective."

Cal. Educ.Code § 330. On June 3, 1998, Proposition 227 took legal force, making Sections 300 through 340 operative for all school terms commencing after August 2, 1998. *See* Cal. Educ.Code § 330 (note to Section 330).

## III. IMPLEMENTATION OF SECTIONS 300 THROUGH 340.

Before Proposition 227's enactment, the Los Angeles Unified School District ("LAUSD") employed a "Master Plan for English Learners," which set forth three bilingual education options for schools to adopt to teach English to LEP students. (July 8, 1998 Marsnik Decl., Exh. A). Under the first option, the "Basic Program," LEP students took "English as a Second Language" courses, while taking their other academic courses in their primary language. (June 18, 1998 Marsnik Decl., 3:25–4:22). The second option, the "Alternative Instructional Program," stressed all instruction in English, with primary language support to aid basic comprehension. (June 18, 1998 Marsnik Decl., 4:23–5:17). Under the third option, "Dual–Language Programs," students were taught in their primary language and in English equally. (June 18, 1998 Marsnik Decl., 5:18–6:25).

On July 28, 1998, the LAUSD issued the "Revision to the Master Plan," which outlines changes that the district is making to comply with Proposition 227's mandates. (First Amended Complaint ("FAC"), 18:21–26). This revised plan provides schools with two options for teaching English to LEP students during their one year of "sheltered English immersion." Under "Model A," schools must provide instruction in English, using students' primary language only to clarify instruction. (July 30, 1998 Marsnik Decl., 3:12–20). Under "Model B," schools must provide instruction in English and "use[ ] a limited amount of primary language to provide a context for learning new concepts in English." (FAC, 15:21–24 (quoting Revision to the Master Plan)). Specifically, Model B uses primary language instruction and materials that emphasize visual and contextual clues to enable students to use and manipulate their knowledge of the English language. (March 22, 1999 Marsnik Decl., 4:12–21). According to the LAUSD, Model B represents "a significant revision of the current Basic Program in the Master Plan for English Learners." (FAC, 15:24–26). Students that obtain a waiver are enrolled in a bilingual education program that either mirrors the Basic Program or the Dual Language Programs described in the original Master Plan. (March 22, 1999 Marsnik Decl., 2:10–20).

To implement Proposition 227, the LAUSD also scheduled training and informational programs for school officials and the parents of LEP students. The district scheduled teacher training in "English immersion methodology" for September or October, 1998. (FAC, 17:5–7). It scheduled developing criteria for placing LEP students into mainstream classrooms for sometime between November, 1998 and January, 1999. (FAC, 17:8–10). In February and March, 1999, the district planned to develop curriculum in "English immersion methodology." (FAC, 17:11–13). In May, 1999, the district scheduled "new curriculum field testing." (FAC, 18:14–15). And the district plans to send parents of LEP students letters notifying them of how to obtain a waiver from the program outlined in the Revision to the Master Plan. (FAC, 19:3–6).

## IV. PROCEDURAL HISTORY.

On July 30, 1998, plaintiffs filed suit in this Court alleging that Proposition 227 violates their federal statutory rights to an equal education. The general thrust of the complaint alleges that the Revision to the Master Plan provides for inadequate teacher training, an ill-prepared curriculum, and inadequate transition and waiver criteria. Represented by the Mexican American Legal Defense and Education Fund and the American Civil Liberties Union Foundation of Southern California, plaintiffs are LEP students affected by the

Revision to the Master Plan. They are suing the school district and Ruben Zacarias, the district's superintendent, in his official capacity.

Along with the complaint, plaintiffs filed an *ex parte* application for a temporary restraining order. On July 31, 1998, the Court denied the application based on findings that: (1) "Plaintiffs' evidence of inadequate teacher training, lack of prepared curricula and instructional materials, and delay in developing transition criteria and waiver procedures, does not demonstrate a likelihood of success on the merits of their claim that the LAUSD Revision violates [federal law]"; (2) because "the evidence indicates that the LAUSD Revision does not constitute as dramatic or 'wholesale' a change as plaintiffs argue," plaintiffs have not demonstrated irreparable injury; and (3) although "there is an undeniable hardship imposed upon teachers and in turn upon students, caused by starting the semester without adequate teacher training, a prepared curriculum, and specialized instructional material," the California electorate's adoption of Proposition 227 demonstrates a public interest favoring denial. (TRO Order, 19:13–18, 20:10–12, 26:14–18, 27:16–24). On August 3, 1998, the Court filed an order certifying a provisional class identical to the class described in the instant motion.

On March 12, 1999, the Court approved a stipulation between the parties that permitted the plaintiffs to file an amended complaint. Like the original complaint, the amended complaint states,

> The Plan's vague mandate and time frame cannot provide for the appropriate identification and assessment of LEP students, an adequate curriculum, appropriate instructional materials, sufficiently trained teachers and other class room [sic] personnel in an unprecedented short period of time. In order to provide an educationally sound program for LEP students, the commencement of any new program must be preceded by careful planning consistent with research and experience, and be based on instructional strategies and materials that have been evaluated and tested.... The LAUSD's implementation of Proposition 227 under the Plan violates its obligations, under the Equal Educational Opportunities Act of 1974, 20 U.S.C. §§ 1701 *et seq.*, to take "appropriate action" to meet the linguistic and other educational needs of plaintiffs and the class they seek to represent.... By replacing a wide range of developed educational options previously available to LEP students enrolled in the LAUSD, the District's implementation of Proposition 227 subjects plaintiff LEP students—who by definition are national origin minorities—to a program that will deny them an adequate opportunity to acquire English language skills sufficient to participate meaningfully in the academic curriculum to the same extent as their grade-level, English speaking peers.

(FAC, 20:21–21:2, 21:9–13, 23:15–22). The thrust of the complaint, therefore, concerns actions the district took to implement Proposition 227, rather than actions by individual schools. The amended complaint states two claims; (1) violation of the Equal Educational Opportunities Act of 1974 arising from the defendants' failure to take "appropriate action" to address English language learning needs of LEP students; and (2) violation of the Civil Rights Act of 1964 by denying national origin minorities a language program that provides them an adequate opportunity to acquire English language skills. (FAC, 21:21–24:18). Plaintiffs pray for declaratory and injunctive relief and attorneys' fees and costs of suit. (FAC, 24:19–25:12). On April 12, 1999, the Court heard oral argument on the motion for class certification.

## V. MOTION FOR CLASS CERTIFICATION.

Plaintiffs move for class certification under Rule 23(a) and Rule 23(b)(2) of the Federal Rule of Civil Procedure. (Motion,

2:2–5). Rule 23(a) provides that a district court may certify a class when,

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition to satisfying the mandates of Rule 23(a), the proposed class members must also demonstrate that they meet one of the requirements of Rule 23(b). In this case, plaintiffs move under Rule 23(b)(2), which provides that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

■ The party moving for certification bears the burden of demonstrating that it meets Rule 23's requirements. *See Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308 (9th Cir.1977). The district court exercises its discretion to determine whether to certify a class. *See id.* at 1309. When making this determination, a district court should bear in mind the two goals behind Rule 23: Class actions promote judicial economy because they minimize the multiplicity of identical suits, and they permit parties with small claims to assert them when they otherwise might not, because of litigation costs that outweigh any potential recovery. *See Crown Cork & Seal Co. v. Parker,* 462 U.S. 345, 349, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *Rand v. Monsanto Co.,* 926 F.2d 596, 599 (7th Cir.1991).

### A. NUMEROSITY.

Rule 23(a)(1) requires that "a class is so numerous that joinder of all members is impracticable." The Supreme Court, in *General Telephone Co. v. Equal Employ-ment Opportunity Commission,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), held that no specific threshold number for class certification exists, but instead, "[t]he numerosity requirement requires examination of the specific facts of each case." *Id.* at 330, 100 S.Ct. 1698. The "exact size of the class need not be known so long as 'general knowledge and common sense indicate that it is large.'" *Perez–Funez v. District Director,* 611 F.Supp. 990, 995 (C.D.Cal.1984) (quoting *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 370 (C.D.Cal.1982)).

Defendants do not dispute that the proposed class is so numerous that joinder is impractical. (Opposition, 9:27–28). At last count, the district is educating 313,442 LEP students for the 1998–1999 school year. (March 22, 1999 Marsnik Decl., 36:15–18). Given that students are continuously enrolling in and leaving the district, this number fluctuates throughout the academic year. Nonetheless, any figure in the three-hundred thousand range certainly qualifies as a class in which joinder of all the members would be impractical. Therefore, the Court finds that the plaintiffs meet this first factor.

### B. COMMONALITY.

#### 1. Legal Standard.

■ Ensuring that a class is not over-inclusive, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The members of the class do not have to share every question of law or fact in common, but "issues ... common to the class as a whole" must exist and "turn on questions of law applicable in the same manner to each member of the class." *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Accordingly, the existence of individual issues remaining "after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsi-*

col Chem. Corp., 855 F.2d 1188, 1197 (6th Cir.1988). Therefore, commonality is met when the court is convinced that class members share enough issues that predominate over their claims that a class action is the most efficient method for adjudicating those claims. *See Califano*, 442 U.S. at 701, 99 S.Ct. 2545.

Nevertheless, courts have struggled to formulate a standard for determining when proposed class members share enough common issues to warrant certification. In two recent civil rights decisions, the Ninth Circuit recognized that when proposed members are moving for certification under Rule 23(a) in conjunction with Rule 23(b)(2), a district court may relax the commonality requirement. *See Hodgers–Durgin v. de la Vina*, 165 F.3d 667, 675–79 (9th Cir.1999); *Walters v. Reno*, 145 F.3d 1032, 1045–48 (9th Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999). These decisions appear to follow the Third and Seventh Circuits' lead in liberalizing Rule 23(a)(2)'s commonality standard by stressing shared interests rather than differences among proposed class members that seek declaratory or injunctive relief. *See Hodgers–Durgin v. de la Vina*, 165 F.3d at 678–79 (citing *Baby Neal v. Casey*, 43 F.3d 48, 56–57 (3d Cir.1994); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 976 (7th Cir.1977)).

In *Walters v. Reno*, 145 F.3d 1032 (9th Cir.1998), the Ninth Circuit reviewed a district court's certification of a class of non-citizens that were asserting that United States officials violated their constitutional rights. *See id.* at 1036. The plaintiffs brought suit on behalf of themselves and similarly situated non-citizens "seeking declaratory and injunctive relief on the ground that the administrative procedures used by the [Immigration and Naturalization Service ("INS")] to obtain final orders under the document fraud provisions of the Immigration and Naturalization Act of 1990 ... violated their rights to procedural due process." *Id.* Plaintiffs claimed that

forms served on aliens charged with fraud did not adequately inform them that if they signed the forms, they were waiving their rights to contest the charges and faced possible deportation. *See id.* at 1036. The district court certified the plaintiff class as,

> All non-citizens who have or will become subject to a final order under § 274C of the Immigration and Naturalization Act because they received notice forms that did not adequately advise them of their rights, of the consequences of waiving their rights or of the consequences of failing to request a hearing.

*Id.* On appeal, the government challenged the district court's commonality finding. *See id.* at 1045. The government pointed to evidence that some INS branch offices disregarded the official policy concerning use of the challenged forms and implemented supplemental explanations of the consequences of signing the forms. *See id.* Therefore, the government concluded, "some aliens who were subject to document fraud charges may have received adequate notice in spite of the constitutionally deficient procedure." *Id.*

The Ninth Circuit rejected this argument, holding that,

> it would be a "twisted result" to permit an administrative agency to avoid nationwide litigation that challenges the constitutionality of its general practices simply by pointing to minor variations in procedure among branch offices and individual INS agents, particularly because the variations were designed to avoid the precise constitutional inadequacies by the plaintiffs in this action.... What makes the plaintiffs' claims suitable for a class action is the common allegation that the INS's procedures provide insufficient notice.

*Id.* at 1046 (citing *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). Visiting an identical argument forwarded by the government in challenging the district court's Rule 23(b)(2) finding, the Ninth Circuit further held,

the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of the rule. . . . It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.

*Id.* at 1047. The Ninth Circuit upheld the district court's class certification. *See id.* at 1048.

In *Hodgers–Durgin v. de la Vina,* 165 F.3d 667 (9th Cir.1999), the Circuit affirmed the commonality standard employed in *Walters. See id.* at 678–79 (discussing *Walters* ). In that case, plaintiffs sued United States Border Patrol agents on behalf of themselves and similarly situated individuals for violations of the Fourth Amendment. *See id.* at 670. They complained that Border Patrol agents were stopping persons driving on Arizona highways solely based on their Latino appearance. *See id.* at 670–71. Plaintiffs moved for certification of a class defined as,

all persons who have been, are, or will be traveling at night by motor vehicle on the highways of the State of Arizona, within the counties of Cochise, Graham, Greenlee, Maricopa, Pima, Pinal, Santa Cruz and Yuma; and all persons who are of Latin, Hispanic or Mexican appearance who have been, are, or will be traveling by motor vehicle on the highways of the State of Arizona within the [above-listed] counties.

*Id.* at 671 n. 5. The district court denied the motion for class certification, finding that the plaintiffs had not demonstrated the requisite "commonality" and "typicality" for a class. *See id.* at 671.

Plaintiffs appealed the denial of their motion for class certification. On appeal, the government argued that commonality did not exist among members of the proposed class: "[E]very traffic stop differs from every other because the agents presumably rely on different combinations of factors to stop different motorists." *Id.* at 676. Rejecting this argument, the Ninth Circuit held that,

it is immaterial why or under what circumstances the agents stop motorists, as along as they stop them without reasonable suspicion. In other words, it is immaterial which factors the agents rely on. What is material are the factors that Plaintiffs allege the agents do not rely on: "specific and articulable facts" that give rise to "a reasonable suspicion . . . that the vehicle contains aliens who may be illegally in this country."

*Id.* at 676 (quoting *Nicacio v. United States I.N.S.* 797 F.2d 700, 702 (9th Cir. 1985)). The Ninth Circuit went on to note that both the Third and Seventh Circuits have adopted this liberalized commonality standard. *Id.* at 678–79 (citing *Baby Neal v. Casey,* 43 F.3d 48, 56–57 (3d Cir.1994); *Alliance to End Repression v. Rochford,* 565 F.2d 975, 976 (7th Cir.1977)). Under these and recent Ninth Circuit cases, the *Hodgers–Durgin* court held, "[t]he 'existence of shared legal issues with *divergent factual predicates* is sufficient' to meet the commonality requirement of Rule 23(a)." *Id.* (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998)) (emphasis added). The Ninth Circuit reversed the denial of class certification and remanded the matter to the district court for further findings. *See id.* at 679.

 Taken together, *Walters* and *Hodgers–Durgin* stand for the proposition that, under Rule 23(b)(2), commonality exists if plaintiffs share a common harm or violation of their rights, even if individualized facts supporting the alleged harm or violation diverge. Conversely, shared core facts support a commonality finding, even if plaintiffs assert disparate legal remedies. These holdings sit squarely with the Advisory Committee Notes to Rule 23, which state that Rule 23(b)(2) enables the prosecution of civil rights actions seeking declaratory or injunctive relief. *See* Fed.

R.Civ.P. 23(b)(2) (Advisory Committee Notes); *Walters v. Reno,* 145 F.3d 1032, 1046 (9th Cir.1998) (noting that Rule 23(b)(2) facilitates civil rights actions). In these types of cases, class members do not seek monetary damages that require a court to make individualized findings regarding the extent of losses. Instead, they typically aim to invalidate a law or practice on constitutional or statutory grounds. The central showing in these suits is that the class members share a general, common violation, rather than a unitary claim premised on identical facts or legal remedies. In short, when addressing commonality of class members proposed under Rule 23(b)(2), a court may employ a liberal definition of commonality.

## 2. Application.

■ Plaintiffs propose the following definition for their class.

All current and future public school children who are enrolled or who will be enrolled in the Los Angeles Unified School District, who have language barriers that impede their equal participation in the District's instructional programs and have been designated as limited English proficient ("LEP") students.

(Motion, 2:12–15). A plain reading of this definition is that class members are current and future LEP students enrolled in the district. The fact that the district maintains statistics on exactly how many LEP students exist in it at a given moment in time demonstrates that the members of the class are identifiable individuals. (March 22, 1999 Marsnik Decl., 36:15–18). Accordingly, the Court finds that the members share a common, distinct identity.

Further demonstrating commonality, these current and future LEP students are uniformly asserting two questions of law. First, by adopting Revisions to the Master Plan on July 28, 1998—just six days before the implementation was to take place—the school district failed to take "appropriate action" under the Equal Educational Opportunities Act of 1974 to meet the English language learning needs of LEP students. Second, the district fails to provide LEP students—who by definition are national origin minorities—with an adequate opportunity to acquire English language skills, in violation of the Civil Rights Act of 1964. (FAC, 21:21–24:18). Plaintiffs do not assert individualized substantive claims.

The Court also finds that members of the class are united by the relief that they seek. Plaintiffs seek declaratory relief invalidating the Revisions to the Master Plan as a matter of law, and they seek injunctive relief to prevent the district from implementing Sections 300 through 340 and the Revisions to the Master Plan. (FAC, 24:19–25:12). Plaintiffs do not assert individualized damages.

Arguing that commonality fails to exist among proposed class members, the defendants stress that plaintiffs' claims and prayer for relief will require the Court to engage in an individualized legal and factual inquiry. (Opposition, 11:1–5).

[T]he inquiry as to whether the District is taking "appropriate action" to address any purported class member's language barriers must be conducted in light of conditions at over 500 separate schools and in light of the individual student's varied circumstances. Only after such individualized inquiry could one say whether a violation of the EEOA exists as to that class member.

(Opposition, 11:1–5). Furthermore, defendants argue that the instant suit is distinguishable from *Walters* and *Hodgers–Durgin* because those cases involve common unlawful procedures and practices applied to variant facts, while the instant suit involves diverse facts that will require individualized legal determinations of whether the district is violating federal law. (Opposition, 11:8–12:3).

Defendants misunderstand the nature of plaintiffs' suit. Their opposition suggests that plaintiffs are suing defendants for the

particularized actions of more than 500 schools and the individualized procedures implemented by thousands of teachers and school officials. Contrary to this characterization, plaintiffs assert that because the district implemented a vague "sheltered English immersion" program to commence just six days after its creation, no school in the district could be in compliance with federal law, regardless of individualized actions taken by any particular school. The amended complaint states,

> The LAUSD's proposed Implementation Plan for Proposition 227 cannot provide an adequate program of instruction for those multi-track schools scheduled to commence their term on August 3, 1998, or any time prior to adequate teacher training and curriculum development. The Plan's vague mandate and time frame cannot provide for the appropriate identification and assessment of LEP students, an adequate curriculum, appropriate instructional materials, sufficiently trained teachers and other classroom personnel in an unprecedented short period of time. In order to provide an educationally sound program for LEP students, the commencement of any new program must be preceded by careful planning consistent with research and experience, and be based on instructional strategies and materials that have been evaluated and tested.

(FAC, 20:17–21:2). In addition, part of this implementation allegedly occurred through LAUSD training and informational sessions for school officials and parents of LEP students between August, 1998 through the present date. (FAC, 17:1–19:6). Based on these and similar allegations, the Court finds that the proposed class displays stronger commonality than the classes in *Walters* and *Hodgers–Durgin:* Not only does the class allege a common violation, that the district is denying every LEP student an equal education, but

the violations are based on common facts, namely that district officials failed to prepare all schools adequately for the "sheltered English immersion" program.

Defendants proceed to explain four ways in which class members' claims differ. First, defendants stress that implementation of Proposition 227 requires four different English learning programs that employ distinct educational theories.[1] (Opposition, 12:14–15:18). Those students choosing to remain in a "sheltered English immersion" classroom will either be taught under Model A or Model B, and those students that obtain a waiver will either be taught under a modification of the Basic Program or Dual Language Programs. (FAC, 15:24–26; March 22, 1999 Marsnik Decl., 2:10–20). Defendants argue that because the latter two only require modification of current programs and the former two require substantially more development, "distinct legal theories and evidence must be presented." (Opposition, 12:15–14:16). This characterization misses the point. Plaintiffs are arguing that regardless of the relative ease or complexity of making a transition to the above described programs, LAUSD could not have taken "appropriate action" in their implementation because of its eleventh hour planning and development of program curriculum. (FAC, 17:1–19:6, 20:17–21:2).

Second, defendants stress that the instant suit requires the Court to examine the practices of over 500 schools, necessitating variant findings and legal determinations. (Opposition, 15:19–17:10). According to the opposition, these schools have different levels of funding, employ teachers with dissimilar approaches to teaching English, and possess diverse instructional materials. (Opposition, 15:28–16:3). Again, the Court will not have to make determinations tailored to over 500 specific schools. Plaintiffs argue that no school, regardless of resources or staff,

---

1. The Court addresses defendants' arguments concerning differences in implementation and teaching methods together.

could have conformed with federal law because of the district's allegedly inappropriate method of implementing Proposition 227.

Third, defendants stress that "the waiver procedure initially divides the class among those who wish to apply for one and those who do not." (Opposition, 17:14–15). Furthermore, defendants argue, the waiver requirements differ between those students who are ten years of age or older and those younger than ten years of age. (Opposition, 17:24–18:1). Defendants also assert that the Court would "have to examine whether the waiver process and educational options had [sic] been adequately explained to the parent in light, perhaps, of that parent's own difficulties in communicating in English and of the parent's work and family commitments that may make a personal visit to the school difficult." (Opposition, 18:5–8). The following constitutes the entirety of the allegations addressing waivers in the amended complaint's "General Allegations" section.

> Proposition 227 provides that parents and guardians may, under highly limited circumstances, apply for "waivers" to exempt their children from the "immersion" program and to receive LEP instruction according to "generally recognized educational methodologies permitted by law," including a bilingual education program.... [P]arents of LEP children also may choose to move their child into a mainstream English language class or "to utilize the waiver process to request a bilingual education program." According to the plan outline, "District staff is currently developing waiver procedures." The implementation plan outline does not specify how the District intends to inform and/or advise parents of LEP students about their various options, including choosing a particular English immersion model, a parental waiver, or a mainstream English language classroom for their child prior to August 3,

1998.... "[The] Revision to *The Master Plan for English Learners* for Implementation of the Proposition 227" ... describes parental exception waiver procedures.... [T]he July 28 Plan contains no target date for ... the parent waiver process.... Moreover, under the District's Plan, parents of LEP children cannot be appropriately informed and advised about available options involving their children's program of instruction.

(FAC, 14:3–8, 16:17–22, 17:22–26, 18:24–25, 19:6, 19:26–20:21, 21:3–6). Taken together, these allegations show that plaintiffs are challenging the district's slow development of waiver procedures, its allegedly inadequate outreach program concerning the availability of the waivers, and its lack of target dates for implementation of waiver programs. Contrary to defendants' characterization, plaintiffs' claims in regard to the waiver process do not turn on whether an individual student's parent can communicate in English or visit the child's school during working hours. Instead, plaintiffs are challenging the district's alleged lack of preparation in adopting a waiver program as it applies to all schools in the district.

Fourth, defendants stress that the learning needs of the district's approximate 300,000 LEP students vary from child to child, requiring the court to make determinations particular to each plaintiff in the class. (Opposition, 18:17–19:19). Defendants argue that teaching methods vary to accommodate a child's learning skills, vary from grade to grade, and vary to account for a child's level of English skills. (Opposition, 19:7–19). Again, defendants mischaracterize plaintiffs' suit as requiring the Court to examine the "sheltered English immersion" program as applied to different populations of students. Contrary to defendants' assertions, plaintiffs are suing defendants for failing to implement adequately Proposition 227's mandates, regardless of the English skill levels or learning needs of individual LEP students.

In short, given that members of the proposed class are easily identifiable, assert two common legal theories, and pray for declaratory and injunctive relief that would apply to all members, the Court finds that commonality exists among class members.

## C. TYPICALITY.

 Ensuring that a class is not under-inclusive, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). " 'The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so ... that the absentees' interests will be fairly represented' " *Hodgers–Durgin v. de la Vina*, 165 F.3d 667, 679 (9th Cir.1999) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir.1994)). Under this factor, a district court must inquire as to whether the named plaintiffs' individual circumstances markedly diverge or whether the legal theories and claims differ as to defeat the purposes of maintaining a class. *See id.* (quoting *Baby Neal*, 43 F.3d at 57–58). However, varying factual differences between the claims or defenses of the class and the class representative will not necessarily render the named representative's claim atypical. *Smith v. B & O R.R.*, 473 F.Supp. 572, 581 (D.Md.1979). A finding of commonality frequently supports a finding of typicality. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting how the commonality and typicality requirements "merge").

 Plaintiffs propose a class of current and future LEP students enrolled in the district. (Motion, 2:12–15). These plaintiffs are challenging the district's implementation of Proposition 227. They are not asserting claims grounded in unique, idiosyncratic facts as to create an under-inclusive class. If the Court finds that the district failed to take "appropriate action" in its implementation of Proposition 227 as to one plaintiff, then it finds inappropriate action as to all LEP students in the district, regardless of the individual actions of particular schools. Moreover, plaintiffs pray for declaratory and injunctive relief that would effect every LEP student in the district. (FAC, 24:19–25:12). They do not request relief that requires the Court to make an inquiry into the facts surrounding each plaintiff's claims. All these factors support the typicality showing.

With tenacious persistence, defendants stress that the variables noted in the commonality discussion "collectively create a complex web of fact patterns that makes each purported class member's claims unique, atypical and incapable of adjudication on a class basis." (Opposition, 21:6–8). They argue that some plaintiffs described in the amended complaint have requested waivers, while others have not, some have been transferred to bilingual education classrooms, while some have chosen to remain in the "sheltered English immersion" program, and within that program, some are enrolled in Model A classes, while others are enrolled in Model B classes. (Opposition, 21:2–23:1). Although the amended complaint's description of class representatives' experiences with the implementation plan varies in detail from student to student, they all share the common grievance that the district did not adequately prepare for the implementation as to all LEP students and all schools. Accordingly, the Court finds that plaintiffs' claims are typical of the class and thereby represent the interests of absent members.

## D. ADEQUACY OF REPRESENTATION.

 Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class they

seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In the Ninth Circuit, representation is "adequate" when counsel for the class is qualified and competent, the representatives' interests are not antagonistic to the interests of absent members, and the action is not collusive in nature. *See Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996); *Sullivan v. Chase Inv. Serv. of Boston*, 79 F.R.D. 246, 258 (N.D.Cal.1978).

Defendants do not dispute this factor. (Opposition, 9:27–28). As discussed above, the named plaintiffs and the class members raise identical claims, and no evidence exists to suggest that the representatives are antagonistic to other members of the class. Furthermore, plaintiffs' counsel, the American Civil Liberties Union Foundation of Southern California and the Mexican American Legal Defense and Education Fund specialize in civil rights litigation and have broad experience in suits challenging initiatives. *See Perez–Funez v. District Director*, 611 F.Supp. 990, 997 (C.D.Cal.1984) (recognizing the American Civil Liberties Union as "qualified and experienced counsel," thereby meeting the adequacy of representation showing). (Cordoba Decl., passim). Accordingly, the Court finds that plaintiffs meet this fourth factor.

### E. RULE 23(b)(2).

In addition to Rule 23(a)'s requirements, plaintiffs must also satisfy one of the requirements outlined in Rule 23(b). *See* Fed.R.Civ.P. 23(b). Plaintiffs move for class certification under Rule 23(b)(2), which provides that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Advisory Committee Notes to Rule 23 recognize that subdivision (b)(2) enables the prosecution of civil rights claims. *See* Fed.R.Civ.P.

23(b)(2) (Advisory Committee Notes); *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.1998) (noting how Rule 23(b)(2) facilitates civil rights actions).

Defendants do not present argument as to why plaintiffs have failed to meet the requirements of Rule 23(b)(2), presumably on the ground that the Court need not reach the issue given the alleged deficiencies concerning Rule 23(a). The Court finds that because plaintiffs seek declaratory and injunctive relief that would invalidate the implementation of Proposition 227 as it applies to all members of the proposed class, plaintiffs meet the requirements of Rule 23(b)(2).

### VI. CONCLUSION.

Upon careful consideration of the moving papers, the opposition, the reply, and oral argument, the Court makes the following findings regarding class certification. With regard to the four requirements of Rule 23(a), the Court finds that,

(1) Because a proposed class of approximately 300,000 LEP students makes joinder impractical, plaintiffs meet the numerosity requirement.

(2) Because plaintiffs argue that no individual school could have complied with federal law given the district's implementation plan, and they seek declaratory and injunctive relief that would cover all members of the class, plaintiffs meet the commonality requirement.

(3) Because plaintiffs' amended complaint does not require unique or idiosyncratic findings regarding each plaintiff, plaintiffs meet the typicality requirement.

(4) Because no conflicts appear to exist between members of the class or their attorneys, and their attorneys are experienced in civil rights litigation, plaintiffs meet the adequacy of representation requirement.

With regard to Rule 23(b)(2), the Court finds that because plaintiffs seek declaratory and injunctive relief that would invali-

date the implementation of Proposition 227 as it applies to all LEP students, plaintiffs have met its requirements. Accordingly, the Court certifies the class defined as,

All current and future public school children who are enrolled or who will be enrolled in the Los Angeles Unified School District, who have language barriers that impede their equal participation in the District's instructional programs and have been designated as limited English proficient ("LEP") students.

IT IS SO ORDERED.